# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-00164-COA

**WASTE MANAGEMENT OF MISSISSIPPI INC.**                    APPELLANT

**v.**

**JACKSON RAMELLI WASTE LLC**                              APPELLEE

DATE OF JUDGMENT:               10/13/2017
TRIAL JUDGE:                    HON. TOMIE T. GREEN
COURT FROM WHICH APPEALED:      HINDS COUNTY CIRCUIT COURT,
                                FIRST JUDICIAL DISTRICT
ATTORNEYS FOR APPELLANT:        LATOYA CHEREE MERRITT
                                FRED L. BANKS JR.
                                NIKITA SHERRELL McMILLIAN
ATTORNEYS FOR APPELLEE:         SHELDON G. ALSTON
                                MATTHEW WADE ALLEN
                                CATHERINE E. LASKY
NATURE OF THE CASE:             CIVIL - CONTRACT
DISPOSITION:                    AFFIRMED IN PART; REVERSED AND
                                RENDERED IN PART; REVERSED AND
                                REMANDED IN PART - 08/06/2019
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE CARLTON, P.J., LAWRENCE AND C. WILSON, JJ.

### CARLTON, P.J., FOR THE COURT:

¶1.     Pursuant to a subcontract that became effective on November 1, 2009, Waste Management of Mississippi Inc. contracted with Jackson Ramelli Waste LLC for Jackson Ramelli to perform trash-collection services in Jackson, Mississippi. Jackson Ramelli subsequently sued Waste Management to recover compensation for trash-collection services it continued to perform, through its subcontractor, after the written subcontract between it and Waste Management expired on September 30, 2010. Waste Management filed a

counterclaim against Jackson Ramelli, alleging breach-of-contract and fraud-based causes of action. After a five-day trial, the trial court granted Jackson Ramelli's motion for a directed verdict on Waste Management's counterclaim, and the Hinds County Circuit Court jury issued a general verdict in Jackson Ramelli's favor, awarding it $1,017,527.56 in damages.

¶2.     Waste Management appeals. For the reasons addressed below, we reverse and render a judgment on Jackson Ramelli's breach-of-contract claim; reverse and remand on Jackson Ramelli's quantum meruit claim with instructions to the trial court that Waste Management be allowed time for discovery to explore and establish any defenses to this claim; and we affirm the trial court's grant of a directed verdict on Waste Management's counterclaim for breach-of-contract and fraud-based causes of action.

**FACTS AND PROCEDURAL HISTORY**

¶3.     On July 30, 2015, Jackson Ramelli sued Waste Management to recover damages for trash-collection work performed for Waste Management from approximately 2012 through 2015. Jackson Ramelli brought the following claims in its complaint: breach of contract, tortious breach of the contract, and breach of the implied covenant of good faith and fair dealing. In support of its claims, Jackson Ramelli alleged that Waste Management failed to pay it for (1) trash-collection services for additional houses in the City of Jackson between 2012 and 2015; (2) consumer price index (CPI) increases between 2012 and 2015; and (3) work performed in March 2015.

¶4.     Waste Management answered and also filed a counterclaim against Jackson Ramelli,

alleging causes of action for misrepresentation, fraud, fraudulent inducement, tortious interference with a contract, breach of contract, and breach of the implied covenant of good faith and fair dealing. In support of its claims, Waste Management alleged that Jackson Ramelli falsely represented to it that Jackson Ramelli, an EBO subcontractor, would perform the trash-collection services covered by the subcontract between Waste Management and Jackson Ramelli. Although the record reflects that Red K Contracting (RKC), a non-minority owned business, actually performed the trash-collection services under a subcontract with Jackson Ramelli, Waste Management claims that it did not know RKC was performing these services for Jackson Ramelli during the course of Waste Management's business relationship with Jackson Ramelli.

¶5.    In January 2016, Waste Management moved to dismiss Jackson Ramelli's lawsuit because it was brought in the name of the wrong entity—the lawsuit was filed in the name of "Jackson/Ramelli, LLC," but the subcontract at issue was between Waste Management and "Jackson Ramelli Waste, LLC." Shortly thereafter, Jackson Ramelli moved to amend its complaint to add a claim for quantum meruit. At the hearing on both of these motions, Jackson Ramelli moved, ore tenus, to correct the legal entity named in its complaint to "Jackson Ramelli Waste, LLC," the name of the entity that entered into the subcontract with Waste Management. Jackson Ramelli did not raise the issue of amending its complaint to add its quantum meruit claim at this hearing. The trial court granted Jackson Ramelli's request to amend the name, denied Waste Management's motion to dismiss, and entered an order on these rulings on July 27, 2016. The trial court's order did not address Jackson

3

Ramelli's request to add a quantum meruit claim. Jackson Ramelli did not challenge or seek clarification of the trial court's order.

¶6. Discovery ensued, and trial was set for October 2, 2017. In the joint pre-trial order the parties submitted in September 2017, Jackson Ramelli raised the quantum meruit claim, asserting that the trial court had not ruled upon its request for leave to amend the complaint to add this claim. Waste Management objected, asserting that the quantum meruit claim had been abandoned. On the first day of the trial, Waste Management raised its objection to Jackson Ramelli's attempt to bring the quantum meruit claim. At that time the trial court found that "the law requires the court to consider it abandoned . . . [and that Jackson Ramelli was] limited to [its] original complaint."

¶7. At trial, the evidence showed that on October 20, 2009, Waste Management and the City of Jackson executed a waste-collection services agreement. The contract required that Waste Management subcontract a portion of the waste-collection work to minority-owned or women-owned businesses and adhere to the City's requirements for an equal-business opportunity (EBO) plan. To fulfill this requirement, Waste Management entered into an agreement with Jackson Ramelli, a certified minority subcontractor pre-approved by the city, to perform certain portions of the waste collection services (the subcontract). The record reflects that Robert Ramelli and Jacque Jackson formed Jackson Ramelli in late 2005. Jackson Ramelli is a company and lists Jackson, an African-American, as the majority 55% owner, and Ramelli, who is Caucasian, as a 45% owner. Ramelli testified at trial that he is the managing partner of Jackson Ramelli. Jackson testified in his deposition, which was read

4

at trial, that Ramelli was responsible for the operational side of the business, while he was responsible for the "marketing side" of the business and did not have any kind of active or sustaining role in the company once he obtained a job.

¶8.    The subcontract between Waste Management and Jackson Ramelli became effective on November 1, 2009, but was not executed until March 2010.  The subcontract provided that Jackson Ramelli would be paid $7.40 per residential unit, and exhibit A to the subcontract provided that there were "approximately 11,175 residential units" in the designated service areas.[1]  The subcontract also provided that Jackson Ramelli's payment rate would be adjusted annually in accordance with the CPI.  Section 6F of the subcontract provided that "[t]his Subcontract may not be assigned in whole or in part by one party without the prior written consent of the other party."  By its terms, the subcontract expired on September 30, 2010.  The subcontract did not have a specific provision allowing either party to renew or extend the term of the agreement, but the subcontract generally provided that it "may be modified or amended by a written instrument executed by both parties hereto."

---

[1] The record reflects that before executing the subcontract with Jackson Ramelli, in compliance with its obligations under the contract with the City, Waste Management conducted a comprehensive count of all of the houses and light commercial entities in Jackson.  The house count identified each unit by whether it was a residence or a commercial entity. Residential units that were unlivable or abandoned were identified in the count and deducted from the final number of homes.  The City then verified and certified the count.  The City's payments to Waste Management were based upon this comprehensive and verified house count.  The City did not pay Waste Management for any additional homes throughout the term of their contract except for homes the City added when the Byram community was annexed in 2010.  Waste Management  assigned Jackson Ramelli service routes with the number of houses/light commercial entities derived from the verified house count.

5

¶9.     As noted, the parties do not dispute that RKC, as Jackson Ramelli's subcontractor, performed all the trash-collection services during the term of the subcontract between Jackson Ramelli and Waste Management and after it expired through March 2015 when Jackson Ramelli and Waste Management's business relationship ended.  RKC was not a minority-owned business.  The testimony at trial established that Jackson Ramelli did not employ any of the workers, own any of the equipment, or lease any of the facilities used to perform the trash-collection services.  The employees, equipment, and facilities all belonged to or were leased by RKC.

¶10.     According to Waste Management it did not know that RKC was performing the trash-collection services for Jackson Ramelli during the relevant time period, and it did not consent to allow Jackson Ramelli to transfer its responsibilities under the subcontract to RKC, a non-minority contractor.  The record reflects that Jim Funderburg, a senior district manager for Waste Management, communicated frequently with David Starks, the owner of RKC, and also communicated with Itoya Robinson, a route manager with RKC, about issues relating to the Jackson Ramelli collection routes.  According to Funderburg, however, Starks told him he "worked for Ramelli" and the record reflects that both Starks and Robinson had "JacksonRamelli" or "Ramelli" e-mail addresses.  The evidence also reflects that in emails and correspondence from Starks to Funderburg, Starks was identified as "CEO Ramelli Waste."  Starks testified at trial that the title "CEO Ramelli Waste" was a "self-appointed title."  He further testified that he did not work for Ramelli, but that "[Ramelli] agreed to allow me to use the CEO title."

¶11.    Starks also testified, however, that there was no question that he was with RKC—that "everybody knew" that he "owned the garbage company . . . [and that] Mr. Ramelli owned the contract." He testified that when he met with Funderburg, he had on a shirt with a large RKC company logo on the sleeve, his business cards showed "Red K. Contracting," and he remembered talking with Funderburg about the logo. Starks also testified that his trucks were used to service the routes, and both truck doors had RKC on the side. Funderburg, however, testified that he does not recall seeing an RKC logo on Starks' clothing, and other Waste Management witnesses testified that the trucks used on the collection routes had "Ramelli" or "Ramelli Waste" on the side. Photos were introduced at trial showing trucks with "Ramelli Waste, LLC" on the side and these trucks were identified as trucks seen on the collection routes. Waste Management witnesses also testified that they did not see any RKC logo or identification on the trucks.

¶12.    Ramelli testified at trial that Waste Management was familiar with the Ramelli Group (Ramelli's companies) through work both companies did in Kenner, Louisiana in 2005 shortly after Hurricane Katrina. Ramelli Group assumed a year of Waste Management's Kenner contract at that time, and Ramelli testified that he used RKC to perform this work. Ramelli further testified that in late 2006 or early 2007, Tim Hawkins, a representative of Waste Management, approached him about trash-collection work in Jackson, Mississippi, because "[h]e was very happy [about] the service that RKC was providing in Kenner . . . and that's why he asked me to expand to Mississippi."

¶13.    Ramelli also testified that the Ramelli Group, using RKC as a subcontractor, began

assisting Waste Management with trash collection in Jackson in 2007. There was no written agreement between the entities at that time. Ramelli testified that in late 2007 or early 2008 Hawkins approached him about needing an EBO for the Jackson contract, and Ramelli told him that Jackson Ramelli was an EBO "and [Hawkins] was more than welcome to use that name." Jackson Ramelli, using RKC, continued to collect garbage for Waste Management, and eventually Jackson Ramelli and Waste Management entered into the written subcontract that became effective on November 1, 2009.

¶14. Evidence and testimony at trial reflect that in October 2011, after the written subcontract expired, Waste Management gave Jackson Ramelli a CPI increase. Starks had asked Funderburg about the 2011 CPI increase in an email dated July 15, 2011. In his email responding to Starks and a representative from another entity, Funderburg stated that "[t]he CPI increase indicated in your respective contracts will be effective October 1, 2011 concurrent with the [City of Jackson] increase outlined in the master agreement." At trial, Funderburg admitted that he was referring to the subcontract between Waste Management and Jackson Ramelli when he said "respective contracts" in his email. Funderburg also testified that Jackson Ramelli submitted an invoice for the 2011 CPI increase and that Waste Management never received an invoice for CPI increases for any subsequent years.

¶15. In January 2012, Jackson Ramelli acquired Metro Waste Systems LLC ("Metro Waste"), the other certified EBO on the contract between Waste Management and the City. Waste Management was not a party to this agreement, but Jackson Ramelli sought Waste Management's approval prior to consummating the transaction and Waste Management and

8

the City modified the EBO plan to reflect that Jackson Ramelli assumed Metro Waste's service routes.

¶16. After acquiring Metro Waste, Jackson Ramelli increased the amount it invoiced Waste Management. Itoya Robinson, the route manager for RKC, testified that the new invoices were adjusted for service to approximately 21,000 homes, although the number of homes was not reflected on the invoices. Jackson Ramelli's monthly invoices increased from $93,660.60 to $165,823.10. According to Robinson, Waste Management continued to assign additional routes to Jackson Ramelli, which further increased the number of homes serviced by Jackson Ramelli.

¶17. The record reflects that from January 2012 through March 2015, Jackson Ramelli submitted regular monthly invoices to Waste Management but did not invoice Waste Management for any CPI adjustments or house number increases, other than the increase following the Metro Waste acquisition. All of the invoices stated they represented amounts due for "services rendered" during the applicable month. Waste Management paid these invoices through March 2015, and Jackson Ramelli accepted payment and continued to provide service.

¶18. Testimony at trial established that Jackson Ramelli, primarily through Starks, requested that Waste Management provide CPI increases for the years after the last increase in October 2011. Starks and Robinson also made repeated requests for compensation for the additional homes being serviced following the Metro Waste acquisition and assignment of additional routes by Waste Management. Funderburg, on behalf of Waste Management,

9

responded to some of these communications, conveying in a letter to Ramelli dated October 27, 2014, for example, that "Waste Management is agreeable to a joint house count verifying the number of homes currently serviced by Jackson Ramelli, LLC in Jackson, Mississippi," and suggesting a way in which this could be accomplished. In that same letter, Funderburg also suggested that "we postpone any discussion of an increase in your compensation until after the house count is completed. In order to increase Ramelli's compensation, Waste Management would need to receive a corresponding increase from the City." In closing, Funderburg's letter provided, "I hope you will be able to continue performing your contractual duties under our agreement. I look forward to working with you in this regard."

¶19. In November 2014, Jackson Ramelli presented Waste Management with a house count unilaterally performed by Jackson Ramelli, showing that it was servicing approximately 23,926 homes. In his letter to Funderburg submitting the house count, Starks acknowledged that the count "may be inaccurate" and Starks testified that Funderburg "didn't agree with [the] numbers" and insisted that the "math was off." A 2016 house count by Jackson Ramelli was also admitted at trial, and it reflected 23,721 serviced homes.

¶20. In the end, the record reflects that from 2012 through 2015 Waste Management did not agree to any CPI increases or an increase corresponding to an increase in homes Jackson Ramelli claimed to be servicing. As noted, Jackson Ramelli did not invoice Waste Management for any additional increases above the approximately 21,000 homes it had been invoicing since 2012 after Jackson Ramelli acquired the Metro Waste routes. Ramelli testified that he did not send any invoices for additional houses without an agreed-upon

10

house count because he believed Waste Management would dispute the amount and that he could not afford to keep doing the work and not get paid.

¶21. Testimony from witnesses for Waste Management and for Jackson Ramelli reflects that in 2014 and in 2015, after the written subcontract had expired, Waste Management demanded and received indemnity from Jackson Ramelli under the indemnification provision of the subcontract. The indemnification related to Waste Management's defense of a lawsuit that was filed in 2014 based upon an accident that occurred in 2012.

¶22. On March 3, 2015, Ramelli sent Funderburg a letter terminating the parties' "sub-contractor's agreement" and gave Jackson Ramelli's "official thirty . . . day notice to withdraw collection services in Jackson, Mississippi." The record reflects that Jackson Ramelli attempted to service the route for half of the month of March, but on March 17, Starks furnished Funderburg with "immediate notice" that it could not service the entire route. Funderburg responded the next day, stating in his email that Waste Management would "take over half of [Jackson Ramelli's] collection responsibilities until the end of this agreement, March 31, 2015." Funderburg testified that Waste Management ended up servicing more than half the route during that time period. Jackson Ramelli invoiced Waste Management for March 2015, but that invoice was not paid.

¶23. On the last day of trial, after Waste Management had presented its case-in-chief, it renewed its motion for a directed verdict on Jackson Ramelli's breach-of-contract claims. The court denied Waste Management's motion, finding that although the written subcontract expired by its terms on September 30, 2010, "there did exist an agreement between Ramelli

and Waste Management beyond that date, the terms of which must come from the conduct and operation of the parties after September 30," which is a factual issue for the jury.

¶24.     The trial court also allowed Jackson Ramelli to amend the complaint "to comply with the proof that has been advanced" by adding a quantum meruit claim.  Waste Management objected, asserting that Jackson Ramelli did not allege a quantum meruit claim in its complaint and that it had abandoned its February 2016 motion to amend its complaint to add this claim.  Additionally, Waste Management moved for a directed verdict on this claim, asserting that Jackson Ramelli waived any right to additional pay for CPI increases or increases for servicing additional homes because it accepted the monthly invoice payments from Waste Management and did not demand more money. The trial court denied Waste Management's motion, finding that "the evidence sufficiently raises the issue for fact determination [by the jury]."

¶25.     Jackson Ramelli moved for a directed verdict on each of the breach-of-contract and fraud-based causes of action in Waste Management's counterclaim, and the trial court granted that motion.

¶26.     Jackson Ramelli's claims for breach of contract and quantum meruit were submitted to the jury.  After deliberating, the jury returned a general verdict of $1,017,527.56 for Jackson Ramelli.

¶27.     Waste Management subsequently filed a motion for judgment notwithstanding the verdict (JNOV) or, in the alternative, for a new trial or a remittitur of damages, which the trial court denied.  Waste Management appeals, asserting that: (1) Jackson Ramelli's breach-

12

of-contract claim should have been dismissed because the subcontract expired in 2010, and there was no other agreement that supported the payment of any additional compensation to Jackson Ramelli; (2) the trial court erred by allowing Jackson Ramelli to amend its complaint on the last day of trial to add a quantum meruit claim; (3) even if the trial court did not err by allowing Jackson Ramelli to amend the complaint to add a quantum meruit claim, Waste Management was entitled to a JNOV because Jackson Ramelli admitted that it did not perform the work and the quantum meruit claim was otherwise legally insufficient; (4) in the alternative, the jury's damages award should be vacated or remitted to an amount supported by the law and the evidence; and (5) Waste Management is entitled to a new trial because the trial court improperly entered a directed verdict on its breach-of-contract and fraud-based counterclaims.

## DISCUSSION

### I. The Jury's General Verdict

¶28. As detailed above, Jackson Ramelli sued Waste Management to recover compensation for (1) trash collection from additional homes that it performed during 2012 through 2015, and (2) annual CPI increases for 2012 through 2015. Two theories of recovery were submitted to the jury: breach-of-contract and quantum meruit. The jury issued a general verdict in Jackson Ramelli's favor, awarding it $1,017,527.56 in damages. Waste Management argues that "a general verdict must be set aside if the jury was instructed that it could rely on any two or more independent grounds, and one of these grounds is insufficient, because the verdict may have rested exclusively on the insufficient ground."

*Thorson v. State*, 895 So. 2d 85, 106-07 (¶47) (Miss. 2004).

¶29.    We find that Waste Management's argument does not apply in this case. The Mississippi case Waste Management relies upon for its argument, *Thorson v. State*, is a criminal case in which the Mississippi Supreme Court was analyzing a specific principle under *Stromberg v. California*, 283 U.S. 359 (1931). *Thorson*, 895 So. 2d at 106-07 (¶47). *Stromberg* was a case in which the Supreme Court reversed a conviction when one of three possible bases for the jury's verdict was unconstitutional. *Stromberg*, 283 U.S. at 370; *see Rodriguez v. Riddell Sports Inc.*, 242 F.3d 567, 577 n.8 (5th Cir. 2001). As explained by the *Rodriguez* court, the *Stromberg* rule is applied "in the criminal context." *Id.* Further, as "the [Supreme] Court explained [in *Griffin v. United States*, 502 U.S. 46, 59-60 (1991)], . . . the *Stromberg* rule should be applied only when jurors have been left the option of relying on a *legally* inadequate theory, not a *factually* inadequate theory." *Rodriguez*, 242 F.3d at 577 n.8. The case before us is not a criminal case, and Waste Management does not argue that the jury instructions were wrong or that the jury was instructed on an incorrect legal theory. Waste Management argues that there were insufficient facts supporting either theory, an argument that makes the *Thorson* analysis inapplicable.

¶30.    As such, we will independently examine both theories of liability before the jury in this case under the general principle that on appeal the Court may not negate a jury verdict on the basis that the jury's verdict rests on one ground "that was not supported by adequate evidence when there existed alternative grounds for which the evidence was sufficient." *Griffin*, 502 U.S. 59-60 (citing *United States v. Townsend*, 924 F.2d 1385, 1414 (1991))

14

(internal quotation mark omitted). *See generally*, 89 C.J.S. *Trial* § 1033 at 486 (2012) ("[W]here a case is submitted to the jury on two or more issues and a general verdict is returned, the verdict will be upheld if it is supported by at least one issue."); 5 Am. Jur. 2d *Appellate Review* § 736 at 580 (2018) ("If there is one alternative ground that is sufficient to support the trial court's decision, the case will normally not be reversed on appeal regardless of whether other grounds are erroneous."). We address the breach-of-contract and quantum meruit theories in turn below.

## II.    The Breach-of-Contract Claim

¶31.    Waste Management asserts that the trial court erred in denying its motions for directed verdict and a JNOV on Jackson Ramelli's breach-of-contract claim because Jackson Ramelli's trial evidence was legally insufficient to establish that Waste Management ever agreed to pay additional compensation for (1) uninvoiced trash collection from additional homes and (2) CPI rate adjustments for the years 2012-2015. In particular, Waste Management asserts that Jackson Ramelli's breach-of-contract claim fails because it is not supported by any written agreement, any invoices submitted by Jackson Ramelli to Waste Management, or any course of dealings between the parties indicating a "mutual assent" to this additional compensation or to contract for such. For the reasons addressed below, we agree with Waste Management on this issue and find that the trial court committed reversible error in allowing Jackson Ramelli's breach-of contract claim to be submitted to the jury. We therefore reverse and render the trial court's denial of Waste Management's motions for a directed verdict and a JNOV on Jackson Ramelli's breach of contract claim.

15

¶32. This Court's "standard of review on motions for directed verdict and judgment notwithstanding the verdict are the same." *Jackson HMA LLC v. Morales*, 130 So. 3d 493, 497 (¶11) (Miss. 2013). In this regard:

> Motions for directed verdict and judgment notwithstanding the verdict consider whether the evidence is sufficient to support a verdict for the non-moving party. When determining whether the evidence was sufficient, the critical inquiry is whether the evidence is of such quality that reasonable and fairminded jurors in the exercise of fair and impartial judgment might reach different conclusions. Thus, this Court considers whether the evidence, as applied to the elements of a party's case, is either so indisputable, or so deficient, that the necessity of a trier of fact has been obviated. For purposes of our review, we consider all evidence in the light most favorable to the nonmoving party, and we view all reasonable inferences in the party's favor.

*Id.* (citations and internal quotation marks omitted).

¶33. To prevail on a breach-of-contract claim, a plaintiff must prove two elements by a preponderance of the evidence: "(1) the existence of a valid and binding contract, and (2) a showing that the defendant has broken, or breached it." *Maness v. K & A Enters. of Miss. LLC*, 250 So. 3d 402, 414 (¶43) (Miss. 2018) (internal quotation marks omitted).[2] In order for there to be a "valid contract," the following essential elements must be present:

> (1) two or more contracting parties, (2) consideration, (3) an agreement that is sufficiently definite, (4) parties with legal capacity to make a contract, (5) mutual assent, and (6) no legal prohibition precluding contract formation.

*Rotenberry v. Hooker*, 864 So. 2d 266, 270 (¶13) (Miss. 2003); *see also Murray Envelope Corp. v. Atlas Envelope Corp.*, 851 So. 2d 426, 429 (¶8) (Miss. Ct. App. 2003).

¶34. Waste Management asserts that Jackson Ramelli's breach-of-contract claim should

---

[2] As recognized in *Business Commc'ns Inc. v. Banks*, 90 So. 3d 1221, 1225 (¶11) (Miss. 2012), "monetary damages are a remedy for breach of contract, not an element of the claim."

16

not have gone to the jury because Jackson Ramelli presented no evidence at trial of a "mutual assent" between the parties as to the number of "additional homes" or compensation based on the number of homes, or that Waste Management would pay Jackson Ramelli for annual CPI increase for 2012-2015. *See Murray Envelope*, 851 So. 2d at 429 (holding the the parties' continued business dealings after expiration of the contract were conducted at-will and not pursuant to a contract in which essential terms were left unresolved).

¶35. Jackson Ramelli, on the other hand, cites *Edwards v. Wurster Oil Co.*, 688 So. 2d 772 (Miss. 1997), among other cases,[3] for the proposition that "a party may be bound by a contract by its actions. A definite and unequivocal course of conduct that demonstrates that a party has assented to it is as binding as if the party had signed the contract in writing." *Id.* at 775. From this principle, Jackson Ramelli asserts that "[t]here was ample evidence at trial to support the jury's verdict that Waste Management should continue to be bound to the Subcontract . . . 'by its actions.'"

¶36. To the extent Jackson Ramelli argues that Waste Management's actions kept the subcontract in effect even after it had terminated by its terms, we find that the cases Jackson Ramelli relies upon to support this argument do not apply. The cases cited by Jackson Ramelli concern how the parties' conduct may ratify or modify an existing contract—not

---

[3] Jackson Ramelli also cites *McInnis v. Se. Automatic Sprinkler Co.*, 233 So. 2d 219, 221 (Miss. 1970); *Old Equity Life Ins. Co. v. Jones*, 217 So. 2d 648, 650-51 (Miss. 1969); *Misso v. Nat'l Bank of Commerce Memphis Tenn.*, 231 Miss. 249, 255, 95 So. 2d 124, 126 (1957); and *Fanning v. C. I. T. Corp.*, 187 Miss. 45, 52, 192 So. 41, 43 (Miss. 1939), for this principle. Additionally, Jackson Ramelli cites *Fletcher v. U.S. Rest. Properties Inc.*, 881 So. 2d 333, 337 (¶7) (Miss. Ct. App. 2004), for the proposition that "[w]hat the parties to a contract consistently do thereunder is evidence of what the contract between them required that they should do."

resurrect an expired contract as Jackson Ramelli appears to argue here.[4]

¶37. We find instead that *Murray Envelope*, 851 So. 2d at 429 (¶8), is instructive. This case involved Murray Envelope and Atlas. The parties entered into a three-year contract, and after the three-year term expired, the parties continued to have business dealings. Atlas sued Murray Envelope for "breach of contract," and the jury returned a verdict of $210,000 in Atlas's favor. *Id.* at 428 (¶¶2-4). The Court found that this was a situation in which "the trial court should have taken the case from the jury." *Id*. at 429 (¶8). The Court found that there was no evidence of a renegotiated contract. *Id.* In particular, the evidence at trial showed that the parties "continued to have business dealings and renegotiated price each year and nothing else. There was no mention of mandatory time; it was a series of at-will agreements. If any essential terms are left unresolved, then no contract exists. . . . While business continued, it was continued under no contract." *Id.* at 429 (¶¶8-9). Under these circumstances, the Court found it was "compelled to reverse and render." *Id.* at 429 (¶9).

¶38. Similarly in this case, the subcontract expired by its terms on September 30, 2010. The evidence shows that after the subcontract expired, the parties continued their business relationship by Jackson Ramelli invoicing Waste Management each month for "services

---

[4] *See Edwards*, 688 So. 2d at 776-77 (finding that the parties' actions ratified the terms of the existing contract); *McInnis*, 233 So. 2d at 221 (finding that the contract was in effect even though it was not officially signed by the parties due to their conduct); *Old Equity Life Ins. Co.*, 217 So. 2d at 650-51 (recognizing that the insured's conduct can imply acceptance of an insurance contract); *Misso*, 231 Miss. at 255, 95 So. 2d at 126 (finding that the company's negotiation of the note at issue constituted an acceptance of the note, although the company did not sign it); *Fanning*, 187 Miss. at 52, 192 So. at 43 (finding that a party's acceptance of an assigned contract was demonstrated by his conduct, though he had not signed it); *Fletcher*, 881 So. 2d at 337 (finding that the existing lease was not modified by the parties' conduct).

rendered," Waste Management paid the invoices (with the exception of the March 2015 invoice), and Jackson Ramelli accepted payment and continued services. Based on our review of the record, we find that "while business continued," *Murray Envelope*, 851 So. 2d at 429 (¶9), it continued on these terms—not bound by the terms of the expired subcontract. As further support for this analysis, we observe that the subcontract provided that it was to be "modified or amended by a written instrument executed by both parties" and the record reflects that this did not occur. *See HeartSouth PLLC v. Boyd*, 865 So. 2d 1095, 1106 (¶¶29-30) (Miss. 2003) (finding no implied renewal of expired contract or creation of a new contract by parties' continued business dealings where expired contract's terms provided that it could be amended or modified only by a signed writing).

¶39. Jackson Ramelli asserts, however, that when Waste Management gave it a CPI increase in 2011 (after the subcontract expired) and when Waste Management paid the 2012 increase for homes serviced when Jackson Ramelli purchased the right to assume Metro Waste's routes, these actions show that Waste Management, by its conduct, intended to remain bound by the compensation terms of the subcontract, including the per-house payments (Section 2.A and Schedule "A" of the subcontract) and the CPI adjustment (Section 2.B of the subcontract).

¶40. We disagree. Payment of the 2011 CPI increase was pursuant to a separate invoice and the record reflects that Jackson Ramelli did not invoice Waste Management again for additional CPI increases. Likewise, the record reflects that the 2012 increase was based upon an increase in Jackson Ramelli's monthly invoices to cover service to approximately 21,000

19

homes (from the original 11,175 homes serviced) when Jackson Ramelli assumed Metro Waste's routes, a transaction acknowledged and approved by Waste Management. Our review of the record reveals no evidence that Jackson Ramelli increased its invoices to reflect any other house count increase or that Waste Management paid for any other increase. We find that the actions Jackson Ramelli describes do not evidence a mutual agreement between the parties that Waste Management would pay Jackson Ramelli for services to more than 21,000 homes or annual CPI increases between 2012 and 2015.

¶41. Jackson Ramelli also refers to other evidence that it asserts shows that Waste Management intended to pay for additional homes serviced, including evidence that (1) Waste Management's representative, Jim Funderburg, was "agreeable to a joint house count," (2) Funderburg sent a few emails or letters after 2010 in which he refers to "the contract" or Jackson Ramelli's "contractual duties," (3) Waste Management sought and obtained indemnification under the subcontract's indemnification clause after the subcontract expired, and (4) Waste Management never told Jackson Ramelli that the subcontract had terminated or expired. We find that this evidence does not support a finding that Waste Management assented to pay for additional homes after the 2012 increase to 21,000 homes when Jackson Ramelli assumed Metro Waste's routes.

¶42. Regarding the first point, although Funderburg did indicate he was agreeable to a joint house count, the record reflects that one never took place. As the record also reflects, Jackson Ramelli did submit two unilateral house counts to Waste Management (the 2014 and 2016 house counts), but RKC owner David Starks acknowledged that the 2014 count "may

20

be inaccurate." He also testified that Funderburg "didn't agree with [the] numbers" and insisted that the "math was off." Regarding the 2016 house count, the record reflects that it was conducted after Jackson Ramelli filed its lawsuit against Waste Management and that it was not presented to Waste Management before the lawsuit commenced. In short, neither of these house counts establishes that Waste Management agreed to or was contractually obligated to provide any additional payment to Jackson Ramelli.

¶43. Regarding Jackson Ramelli's second point about a few references to "the contract" or Jackson Ramelli's "contractual duties" made by Funderburg after the subcontract expired, we find that these references do not evidence a "mutual assent" to the specific compensation terms in the subcontract. Finally, the last two points Jackson Ramelli raises are simply inapplicable. Waste Management's reliance on the subcontract's indemnification provision may signify its intent that this particular provision should be carried forward, but it has nothing to do with compensation for services performed under the subcontract. Further, Waste Management had no obligation to inform Jackson Ramelli that the subcontract expired. There is no dispute that two sophisticated entities to a contract can read and apply the plain language of the subcontract's "Term" provision along with the subcontract provision that any modification or amendment to the subcontract was to be evidenced "by a written instrument executed by both parties hereto." *See Beaumont Homes LLC v. Colonial/Jordan Properties LLC*, 71 So. 3d 1238, 1240 (¶8) (Miss. Ct. App. 2011) (finding that the buyer was bound by the mutually-agreed-upon terms of the contract where there was no contention that the buyer, a sophisticated real-estate developer, did not understand its

terms).

¶44.   For the reasons addressed above, we find that the trial court erred in allowing Jackson Ramelli's breach-of-contract claim to go to the jury and we reverse and render on that claim.

### III.   The Quantum Meruit Claim

¶45.   Waste Management asserts both procedural and substantive grounds for reversing the trial court's determinations relating to Jackson Ramelli's quantum meruit claim. Procedurally, Waste Management asserts that the trial court erred when it allowed Jackson Ramelli to amend its complaint to include the quantum meruit claim after Waste Management rested at trial and after the trial court had appeared to deny the claim before trial. As a substantive matter, Waste Management asserts that the trial court erred in denying its motions for a directed verdict and a JNOV on the quantum meruit claim because Jackson Ramelli failed to present sufficient evidence to support a jury verdict on that claim.

¶46.   As detailed below, we find that the trial court abused its discretion when it allowed Jackson Ramelli to amend its complaint to include the quantum meruit claim after the close of evidence in this case. We also find, however, that the trial court did not err in denying Waste Management's motions for a directed verdict and a JNOV on Jackson Ramelli's quantum meruit claim. Under these circumstances, therefore, we reverse and remand for a new trial on the quantum meruit claim with instructions to the trial court that Waste Management be allowed time for discovery to explore and establish any defenses to this claim, including an unclean hands defense or other equitable defenses.

### A.   Amendment of the Complaint to Allow the Quantum Meruit Claim After the Close of Evidence

22

¶47. We begin by addressing Waste Management's assertion that the trial court erred when it allowed Jackson Ramelli to amend its complaint to include a quantum meruit claim after the close of evidence. We review the trial court's decision to allow a party to amend under an abuse of discretion standard. *McCarty v. Kellum*, 667 So. 2d 1277, 1283 (Miss. 1995).

¶48. As detailed above, although Jackson Ramelli moved to amend its complaint to allow a quantum meruit claim in February 2016, about six months after it filed its original complaint, Jackson Ramelli never obtained a ruling on that issue.[5] Jackson Ramelli did not raise the issue again until it included that claim in the September 2017 pretrial order. Waste Management set forth its objection in the pretrial order, and on the first day of trial Waste Management raised its objection before the trial court, arguing that the claim had been abandoned. After argument, the trial court stated: "We'll see. We'll see if there's any evidence to support any injunction [sic,]. . . but it should have been an order [or] the law requires the court to consider it abandoned. . . . [A]s of right now it hadn't been served and it hadn't been responded to, and you [Jackson Ramelli] are limited to your original complaint."

¶49. After ruling before trial that Jackson Ramelli was limited to its breach-of-contract claim, the record reflects that the trial court appeared to reinforce this ruling by preventing

---

[5] At the June 2016 hearing on this motion and Waste Management's motion to dismiss Jackson Ramelli's lawsuit because it was brought in the name of the wrong entity, Jackson Ramelli only moved ore tenus to correct its complaint to reflect the correct Jackson Ramelli entity. The issue of amending Jackson Ramelli's complaint to add its quantum meruit claim was not addressed at the hearing. The trial court's July 2016 order denied Waste Management's motion to dismiss and granted Jackson Ramelli's motion to correct its name in the complaint. The order does not address Jackson Ramelli's request to amend its complaint to add the quantum meruit claim.

Waste Management from even mentioning the doctrine of unclean hands. The trial court stopped Waste Management's cross-examination of Robert Ramelli, sent the jury out, and asked Waste Management's counsel to clarify her line of questioning. In the course of counsel's explanation, she mentioned the doctrine of unclean hands in the context of Jackson Ramelli's request for additional compensation. The following exchange took place:

> THE COURT: And under month to month there would still be a reason for compensation. The argument now is whether they were entitled to anything more than what their services would have been provided, whether they had a contract or not.

> MS. MERRITT: Your Honor, but the doctrine of unclean hands even deals with –

> THE COURT: *Don't go there with me. We're dealing with law and not equity.* Right now the only thing that's out here if you argue that there is no contract pretty much is quantum merit.

> MS. MERRITT: Right, Judge. And that's not a claim that they brought here. That's not in the complaint. The court recognized on day one that that was not in the complaint. It was not served on us.

> THE COURT: Okay. [continuing on to another issue].

(Emphasis added).

¶50.    At the end of trial, after Waste Management presented its case-in-chief, the trial court announced that it would allow amendment of the complaint so that Jackson Ramelli could assert a quantum meruit claim based on the evidence.

¶51.    We begin by addressing application of Rule 15(b) of the Mississippi Rules of Civil Procedure in this context. The first two sentences of Rule 15(b) apply to a situation in which an issue not raised by the pleadings is tried by the express or implied consent of the parties,

24

as follows:

> When issues not raised by the pleadings are tried by expressed or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.

M.R.C.P. 15(b). The record reflects and the parties agree that this portion of Rule 15(b) does not apply in this case because Waste Management did not expressly or impliedly consent to an amendment allowing Jackson Ramelli's quantum meruit theory. We therefore must proceed to the last two sentences of Rule 15(b) that allow an amendment only if the party affected would not be prejudiced, as follows:

> [T]he court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the maintaining of the action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence. The court is to be liberal in granting permission to amend when justice so requires.

M.R.C.P. 15(b).

¶52.    In this case, for over a year-and-a-half Jackson Ramelli never sought a ruling on its motion to amend its complaint to add a quantum meruit claim. Discovery ensued. Less than a month before trial Jackson Ramelli sought to include the quantum meruit claim in the pretrial order. Waste Management objected, and raised the issue before the trial court on the first day of trial. At that time, the trial court "limited [Jackson Ramelli] to [its] original complaint." During trial the court admonished Waste Management's counsel from even

25

mentioning the doctrine of unclean hands (an equitable defense to a quantum claim),[6] telling

counsel, "Don't go there with me. We're dealing with law and not equity." After the close

of evidence the trial court then allowed Jackson Ramelli to assert the quantum meruit claim.

¶53.   We find that Waste Management was substantially prejudiced by this course of events.

Waste Management defended the action predicated on the breach-of-contract claims pled in

the complaint—not quantum meruit. Because the trial court did not allow the quantum

meruit claim to be added until after the close of evidence, Waste Management was not

afforded the opportunity to conduct discovery on the issue or to adequately prepare and assert

any equitable defenses relevant to a quantum meruit claim, including, but not limited to

affirmative defenses such as unclean hands or laches.

¶54.   As the Mississippi Supreme Court has recognized:

> Freedom to grant leave to amend when justice so requires, as provided by the
> [Mississippi Rules of Civil Procedure], diminishes as the litigation progresses.
> Since *prejudice to the opposing party is the key factor governing the court's
> discretion in granting leave to amend a pleading*, the court will ordinarily
> refuse to grant such permission where the motion comes so late and in such
> circumstances that the right of the adverse party will necessarily be
> prejudicially affected.

*McCarty*, 667 So. 2d at 1284-85 (quoting 61A Am. Jur. 2d *Pleadings* § 315 (1981)); *see*

*Harmon v. Regions Bank*, 961 So. 2d 693, 701 (¶28) (Miss. 2007) ("Although the trial court

has discretion to allow an amendment, it should not allow amendment when to do so would

prejudice the defendant."); *see also T. J. Stevenson & Co. v. 81,193 Bags of Flour*, 629 F.2d

338, 370 (5th Cir. 1980) ("[I]t is not often that amendments are allowed after the close of

---

[6] *See, e.g.*, *Estate of Van Ryan v. McMurtray*, 505 So. 2d 1015, 1019 (Miss. 1987)
(applying unclean hands doctrine to bar quantum meruit recovery).

evidence, since the opposing party may be deprived of a fair opportunity to defend and to offer any additional evidence.") (internal quotation mark omitted). We find that this is a situation in which the trial court abused its discretion in allowing the quantum meruit amendment. Accordingly, we reverse and remand for a new trial on Jackson Ramelli's quantum meruit claim.

### B. The Trial Court's Denial of Waste Management's Motions for a Directed Verdict and a JNOV on the Quantum Meruit Claim

¶55. We next turn to Waste Management's assertion that that the trial court erred in denying its motions for a directed verdict motion and a JNOV on Jackson Ramelli's quantum meruit claim. We review this assertion de novo based upon the standard set forth above that requires us to "consider all evidence in the light most favorable to the nonmoving party [Jackson Ramelli] and . . . view all reasonable inferences in [that] party's favor." *See Jackson HMA LLC*, 130 So. 3d at 497 (¶11).

¶56. As recognized by the Mississippi Supreme Court, "a prerequisite to establishing grounds for quantum meruit recovery is claimant's reasonable expectation of compensation." *In re Estate of Fitzner*, 881 So. 2d 164, 173 (¶25) (Miss. 2003). The essential elements of a quantum meruit claim are as follows:

> (1) valuable services were rendered or materials furnished; (2) for the person sought to be charged; (3) which services and materials were accepted by the person sought to be charged, used[,] and enjoyed by him; and (4) under such circumstances as reasonably notified person sought to be charged that plaintiff, in performing such services, was expected to be paid by person sought to be charged.

*Id.*

27

¶57.   Waste Management asserts that there is no evidence that Jackson Ramelli had a "reasonable expectation of compensation" with respect to additional homes served or annual CPI increases.  We disagree.  The trial testimony of RKC's owner, David Starks, describing his interactions with Waste Management's Jim Funderburg on these issues, and the numerous emails and correspondence between RKC or Jackson Ramelli and Waste Management on these issues is sufficient evidence to create a fact issue for the jury on this factor.[7]

¶58.   Likewise, we also find that there was sufficient evidence to create a fact question for the jury on the essential elements of Jackson Ramelli's quantum meruit claim.  The record reflects that Jackson Ramelli, through its subcontractor, RKC, performed trash-collection services in the City of Jackson between 2012 and 2015.  The record also reflects that Waste Management accepted and enjoyed these services.  Further, according to the testimony of Itoya Robinson, the route manager for RKC, Waste Management continued to assign additional routes to Jackson Ramelli.  Finally, as reflected in the trial testimony of David Starks and in numerous emails and correspondence between Starks or Robert Ramelli and Jim Funderburg, Jackson Ramelli "reasonably notified" Waste Management that it expected

---

[7] The dissent asserts that "[g]iven that Waste Management consistently refused to agree to any increase in compensation, Jackson Ramelli could not have had any 'reasonable expectation' of additional compensation for its services."  We find, however, that the evidence considered as a whole, including correspondence and emails from both before and after the October 2014 correspondence discussed by the dissent, is neither "so indisputable, [nor] so deficient, that the necessity of a trier of fact has been obviated" on the reasonable expectation element of Jackson Ramelli's quantum meruit claim.  In short, we find there is sufficient evidence to support the chancery court's decision to deny Waste Management's JNOV motion under the applicable standard of review.  *Jackson HMA LLC*, 130 So. 3d at 497 (¶11).

to be paid for CPI increases and services for additional homes.[8]

¶59.	Based on our review of the record we find that the evidence, as applied to the elements of Jackson Ramelli's quantum claim, is not "so indisputable, or so deficient, that the necessity of a trier of fact has been obviated." *Jackson HMA LLC*, 130 So. 3d at 497 (¶11). For this reason, although we reverse based on the trial court's procedural error addressed above, we remand the quantum meruit claim for further discovery and a new trial.

### IV.	Plaintiff's Exhibit P-32 Consisting of a Chart of Additional Compensation Calculations

¶60.	Jackson Ramelli used an exhibit at trial ("P-32") consisting of a one-page chart setting forth calculations for additional compensation that it believed it was owed based upon annual CPI increases and service to additional homes. The calculations covered the time period from January 2012 through sixteen full days and eleven half-days in March 2015.[9] The

---

[8] For example, in October 2014 Robert Ramelli wrote to Jim Funderburg as follows:

> It has come to my attention that David Starks has been in contact with you on several occasions regarding the house count in Jackson, Mississippi. Mr. Starks believes that we are picking up in excess of . . . about 5,000 households for which Jackson[]Ramelli is not being paid for.

> We are now formally requesting that a house count be conducted for verification in addition to an increase in price per household compensation. We are currently receiving $7.82 per household and are requesting an increase of $1.84 per house. This increase would bring our price to $9.66 per household.

> Please take time to consider our proposal. We are currently working at a deficit and may find it necessary to withdraw our services should we fail to reach an amicable agreement.

[9] Exhibit P-32 is attached as an Appendix.

29

record reflects that Jackson Ramelli's counsel explained to the trial court that the exhibit was to be used for demonstrative purposes only and the exhibit was produced pretrial as a demonstrative exhibit only. On its own initiative, however, the trial court allowed P-32 into evidence and allowed the jury to have the exhibit during deliberations.

¶61. Waste Management asserts that the trial court erred in doing so. In response, Jackson Ramelli's only argument is that P-32 was properly used as *demonstrative* evidence "to assist the jury in understanding an issue presented at trial." *Mitchell v. Glimm*, 819 So. 2d 548, 552 (¶10) (Miss. Ct. App. 2002). We agree, as we held in *Mitchell v Glimm*, that a proper use of demonstrative evidence is to assist the jury. *Id.* Relevant here, however, is that in making this determination we specifically noted in *Mitchell v Glimm* that "[t]he chart was not introduced into evidence during the course of the trial." *Id.* In this case, we find that the trial court erred because it allowed the chart into evidence and allowed the jury to have it during its deliberations.

¶62. In allowing P-32 into evidence, the trial court treated the chart as a summary and ruled that it could go into evidence along with the witness's testimony. Rule 1006 of the Mississippi Rules of Evidence allows the use of summaries and charts as follows:

> The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

Waste Management argued before the trial court and asserts on appeal that the chart was not admissible as a summary of the evidence because Waste Management had not been given the

30

underlying documentation supporting the calculations in the chart. As noted, both parties treated the exhibit as demonstrative evidence and any underlying documentation was not supplied. Nor is there any indication what CPI index was used in the calculations. We find it was error for the trial court to allow P-32 into evidence for these reasons.

¶63. Additionally, as Waste Management also argued before the trial court and asserts on appeal, even though the trial court ruled that the general three-year limitations period under Mississippi Code Annotated section 15-1-49 (Rev. 2012) applied to Jackson Ramelli's claims, P-32 includes calculations from a seven-month period (January 2012 to July 2012) that fall outside the statute-of-limitations period. The trial court did not strike those particular calculations, or provide for any other adjustment or explanation to the jury. Exhibit P-32 should not have been allowed into evidence for this additional reason.

## V. Waste Management's Breach-of-Contract and Fraud-Based Counterclaims

¶64. Waste Management asserts that the trial court erred when it granted Jackson Ramelli's motions for a directed verdict on Waste Management's breach-of-contract and fraud-based claims. We first observe that these claims are both governed by section 15-1-49, Mississippi's general catch-all three-year statute of limitations.[10] Waste Management's counterclaim was filed September 30, 2015—six years from the time the parties negotiated and entered into the subcontract, when Waste Management presumably was "induced" to

---

[10] *See Archer v. Creel*, 217 So. 3d 690, 693 (¶11) (Miss. Ct. App. 2016) ("[F]raud claims have a three-year statute of limitations."); *Wallace v. Greenville Pub. Sch. Dist.*, 142 So. 3d 1104, 1106 (¶8) (Miss. Ct. App. 2014) ("Causes of action for breach of contract are subject to the three-year statute of limitations set forth in . . . section 15-1-49.").

used Jackson Ramelli to satisfy its EBO Plan obligations, and five years after the subcontract expired. For purposes of our analysis, however, we will assume that a fact question exists as to whether the discovery rule tolls the limitations period so as to prevent these claims from being time-barred. Nevertheless, we affirm the trial court's decision to grant a directed verdict on these claims for the reasons addressed below.

¶65. As stated in Waste Management's brief, Waste Management's breach-of-contract claim is that "Jackson[]Ramelli materially breached the parties' written subcontract by failing to perform any of the waste collection services and instead subcontracting the work out to a non-minority contractor, RKC, without Waste Management's or the City's knowledge or consent." Based upon our review of the record, we find that it does not contain legally sufficient evidence that Jackson Ramelli breached the subcontract, or any subsequent oral agreement between the parties, on that basis. Section F of the subcontract provides: "Assignment. This Subcontract may not be assigned in whole or in part by one party without the prior written consent of the other party." The plain language of the subcontract only prohibits an assignment of the subcontract, not subcontracting out the work to be performed under the subcontract. Nor does our review of the record reveal any evidence that would support an assertion that the parties agreed to prohibit subcontracting out the trash-collection work after the written subcontract expired. We find no error in the trial court's decision to grant Jackson Ramelli's directed verdict on this claim.

¶66. As Waste Management recognizes with respect to its fraud-based claims, in order to establish these claims the following elements must be proven by clear and convincing

32

evidence:

> (1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) his intent that it should be acted on by the hearer and in the manner reasonably contemplated, (6) the hearer's ignorance of its falsity, (7) his reliance on its truth, (8) his right to rely thereon, and (9) his consequent and proximate injury.

*Saucier v. Peoples Bank of Biloxi*, 150 So. 3d 719, 733-34 (¶71) (Miss. Ct. App. 2014).

¶67. According to Waste Management, it retained Jackson Ramelli "solely to satisfy its EBO Plan obligations, as stated in [Waste Management's] contract with the City of Jackson." As Waste Management explains in its brief, "by representing that Jackson[ ]Ramelli had equipment and employees to perform residential waste collection services in Jackson, Robert Ramelli fraudulently induced Waste Management and the City of Jackson to rely on the misrepresentation and retain Jackson[ ]Ramelli for such services."

¶68. Based on our review of the record, we find no evidence of a "*consequent* and *proximate* injury," *Saucier*, 150 So. 3d at 734 (¶71) (emphasis added), to Waste Management caused by these alleged misrepresentations. The crux of Waste Management's fraud-based claims is that it was fraudulently induced to retain Jackson Ramelli and it retained Jackson Ramelli "solely" to meet it EBO Plan obligations under its contract with the city—but we find no evidence in the record that Waste Management suffered any injury relating to its EBO Plan obligations. The contract between Waste Management and the City was not terminated, nor is there any evidence that Waste Management suffered any other consequences with respect to the EBO Plan obligations and its retention of Jackson Ramelli. Because we find no evidence of an injury suffered by Waste Management proximately

caused by Jackson Ramelli's alleged misrepresentations, we find no error in the trial court's decision to grant Jackson Ramelli's directed verdict on Waste Management's fraud-based claims.

¶69. For the foregoing reasons, we reverse and render judgment on Jackson Ramelli's breach-of-contract claim; reverse and remand on Jackson Ramelli's quantum meruit claim, with instructions to the trial court that Waste Management be allowed time for discovery to explore and establish any defenses to this claim, including its unclean hands defense; and affirm the trial court's judgment on Waste Management's breach-of-contract and fraud-based claims.

¶70.  **AFFIRMED IN PART; REVERSED AND RENDERED IN PART; REVERSED AND REMANDED IN PART.**

**BARNES, C.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR. J. WILSON, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY TINDELL, J.**

**J. WILSON, P.J., CONCURRING IN PART AND DISSENTING IN PART:**

¶71. I concur that Jackson Ramelli's breach of contract claim must be reversed and rendered because Waste Management never agreed to pay for uninvoiced houses in excess of the original (verified) house count or CPI increases for 2012-2015.[11] I dissent in part because Jackson Ramelli's quantum meruit claim should also be reversed and rendered, and a final judgment should be entered in favor of Waste Management. As the majority explains, Jackson Ramelli specifically requested additional compensation for alleged increases in

---

[11] I also concur that the circuit court did not err by granting Jackson Ramelli's motion for a directed verdict on Waste Management's counterclaims.

houses and CPI adjustments, but Waste Management never agreed to any of Jackson Ramelli's requests. Furthermore, Jackson Ramelli continued to submit invoices based on the original house count and without any CPI increases for years after 2011. "[A] prerequisite to establishing grounds for quantum meruit recovery is [the] claimant's reasonable expectation of compensation." *In re Estate of Fitzner*, 881 So. 2d 164, 173 (Miss. 2003). Jackson Ramelli's quantum meruit claim fails because it could not have had any "reasonable expectation" of additional compensation.

¶72. On appeal, Jackson Ramelli argues that its claim is supported by several letters and emails in which David Starks and Robert Ramelli asked Waste Management to increase Jackson Ramelli's compensation. However, the real significance of this correspondence is that it shows that Waste Management never agreed to any of the requests.

¶73. In a July 2014 email to Jim Funderburg, Starks stated that he had noticed that Jackson Ramelli had not received its "CPI increase." Funderburg responded that Waste Management "did not get a CPI" from the City. At trial, Funderburg explained that Waste Management would not grant Jackson Ramelli a CPI increase because Waste Management had not received a corresponding CPI increase under its prime contract with the City. Starks clearly understood that Funderburg had denied his request. Starks replied, "Ugh!"

¶74. In an October 2014 letter to Funderburg, Robert Ramelli stated that he believed that Jackson Ramelli was serving approximately 5,000 households for which it was not being paid. Ramelli requested both a new "house count" and an "increase in per household compensation." Specifically, he requested an increase in pay from $7.82 per household to

35

$9.66 per household.  Ramelli stated, "We are currently working at a deficit and may find it necessary to withdraw our services should we fail to reach an amicable agreement."

¶75.    Ramelli testified that Funderburg verbally rejected his request for an increase in per household compensation.  In addition, Funderburg responded to Ramelli by letter dated October 27, 2014:

> Waste Management is agreeable to a joint house count verifying the number of homes currently serviced by Jackson Ramelli . . . . We will also invite the City to participate since a potential increase or decrease in the number of homes will need to be agreed upon by the City in order for us to be paid for any additional homes or credit due to reduction.
>
> I also suggest we postpone any discussion of an increase in your compensation until after the house count is completed. In order to increase Ramelli's compensation, Waste Management would need to receive a corresponding increase from the City.

¶76.    Starks promptly responded to Funderburg's letter.  In an email, Starks stated, "Your proposal is an excellent idea and I believe that Robert [Ramelli] and I are both in agreement with the letter in its' [sic] entirety."

¶77.    The correspondence cited by Jackson Ramelli does not support its quantum meruit claim.  To begin with, although the cited correspondence about a new "house count" began in mid-2014, Jackson Ramelli claimed at trial that it was entitled to compensation for uninvoiced homes beginning in *January 2012*.  Jackson Ramelli claims that it raised this issue with Waste Management prior to the 2014 correspondence, but the testimony about when that occurred was vague.  More important, there is no evidence in the record of anything that occurred between 2012 and 2014 that would have given Jackson Ramelli a "reasonable expectation" of additional compensation.

36

¶78. Moreover, there is nothing in the 2014 correspondence to support a "reasonable expectation" of any additional compensation. Ramelli's October 2014 letter suggested that Jackson Ramelli *might* "find it necessary to withdraw its services" at some point in the future if it did not receive a pay increase. But that only demonstrates Jackson Ramelli's clear understanding that Waste Management had *not* agreed to any increase in pay. In addition, Funderburg's response made clear that Waste Management *would not* agree to any increase Jackson Ramelli's compensation unless the City first granted Waste Management a corresponding increase under the prime contract. Starks then responded that he and Ramelli were in full "agreement" with Funderburg's letter. Throughout this period, Jackson Ramelli continued to submit invoices based on the original house count and without any CPI increases for years after 2011. Given that Waste Management consistently refused to agree to any increase in compensation, Jackson Ramelli could not have had any "reasonable expectation" of additional compensation for its services. Until Waste Management *actually* agreed to an increase, no such expectation would have been reasonable.

¶79. With respect to Jackson Ramelli's quantum meruit claim, the relevant facts are not complicated: Jackson Ramelli asked for pay increases, Waste Management refused, and Jackson Ramelli then continued to provide services without any increase in pay. Jackson Ramelli expressed its opinion that it was being under-compensated, and it asked for more money. But Waste Management did not share that opinion, and it never agreed to any additional compensation. Under these circumstances, Jackson Ramelli could not have had any "reasonable expectation" of additional compensation. Accordingly, Jackson Ramelli's

quantum meruit claim should be reversed and rendered, and a final judgment should be entered in favor of Waste Management.  I respectfully concur in part and dissent in part.

**TINDELL, J., JOINS THIS OPINION.**

# APPENDIX

| | | |
|---|---|---|
| Jan. 12-Sept. 12 (9 months) | 2,516 x $7.82/house x 9 months<br>CPI paid on 21,205 houses | $177,076.08 (houses) |
| Oct. 12-Sept. 13 (12 months) | 2,516 x $8.05/house x 12 months<br>21,205 houses x ($8.05-$7.82) x 12 mos (23¢) | $243,045.60 (houses)<br>$58,525.80 (CPI)<br>$301,571.40 (total) |
| Oct. 13-Sept. 14 (12 months) | 2,516 x $8.17/house x 12 months<br>21,205 houses x ($8.17-$7.82) x 12 mos (35¢) | $246,668.64 (houses)<br>$89,061.00 (CPI)<br>$335,729.64 (total) |
| Oct. 14- Feb. 15 March 2015 (16 full days; half of 11 days) | 2,516 x $8.33/house x 5 months<br>21,205 houses x ($8.33-$7.82) x 5 mos (51¢)<br>March = $7,318.37 per day<br>16 full days = $117,093.88<br>Half of 11 days = $40,251.02 | $104,791.40 (houses)<br>$54,072.75 (CPI)<br>$157,344.91 (March)<br>$316,209.06 (total) |
| TOTAL DUE | | $1,130,586.18 |

EXHIBIT
P-30