RANDOLPH, Presiding Justice,
for the Court:
¶ 1. Dr. Adolfo P. Morales sued Jackson HMA, LLC., d/b/a Central Mississippi Medical Center (“Jackson HMA”), in the Circuit Court of Hinds County for breach of contract. A jury awarded Morales substantial damages. Jackson HMA filed a “Motion for Judgment Notwithstanding the Verdict, and, in the alternative, For a New Trial” and a “Motion for Amendment of Judgment.” Judge Winston Kidd denied the post-trial motions and Jackson HMA filed this appeal.

FACTS

¶ 2. In early 2004, based on a survey conducted by a third party, Jackson HMA recognized a shortage of ophthalmologists within its medical community. To address this perceived need, Jackson HMA undertook to recruit an ophthalmologist. Tess Shaw, physician recruiter for Jackson HMA, communicated with CompHealth Associates, Inc., a company which assists in matching physicians with hospitals. CompHealth had a contract with HMA, which is the parent corporation of Jackson HMA. CompHealth recommended Morales *496 to Jackson HMA as a potential fit to meet the hospital’s need. After conducting a background examination of Morales, Jackson HMA began negotiating terms to bring him to Jackson.[1]
¶ 3. On September 24, 2004, Shaw sent Morales a “letter of intent” outlining Jackson HMA’s proposed offer.[2] The letter twice stated that the proposed offer required “preapproval” by “Corporate” (HMA). Although not requested or provided for, Morales signed and returned the letter. On it he wrote “I agree to all and accept the terms of your offer.” At trial, Morales acknowledged that this letter was not a contract, as it “no doubt” required preapproval from the corporate office.
¶ 4. Subsequently, Jackson HMA sought approval from corporate HMA, but corporate did not approve the terms. Jackson HMA’s CEO, Jay Finnegan, impressed upon corporate the need for an ophthalmologist and suggested new terms to corporate which reduced the guaranteed amount and period by half. Finnegan received approval of these reduced terms from Pete Lawson, HMA vice-president for the eastern part of the United States.
¶ 5. Thereafter, on November 11, 2004, Shaw sent Morales a second letter detailing the new “terms of our offer[,]” which reflected the reduced guarantees approved by corporate HMA. The letter lacked the phrase “letter of intent” and also made no reference to a requirement of corporate approval of the terms. The letter included the language, “[b]y signing and returning this letter, you will confirm your commitment to entering into a contractual agreement.... Accordingly we will begin the process of assimilating contract documents for your review.”
¶ 6. Six days later, on November 17, 2004, Shaw sent Morales a “Memorandum” which restated the terms of the November 11 letter.[3] Attached to this memorandum were contract documents (entitled “Physician Recruitment Agreement”) and several addenda to that agreement. Provision 7.01 of the Physician Recruitment Agreement provided, in pertinent part, “[t]his agreement, and any addenda or amendments thereto, shall not be effective or legally binding on Physician or Hospital until they have been reviewed and approved in writing by Hospital’s legal counsel.” Morales signed the document, but approval never arrived. According to Shaw, HMA experienced an organizational restructure in the interim, and Jackson HMA no longer reported to Pete Lawson, but now reported to a new vice-president, John Vollmer. Shaw testified that Vollmer “did not feel that the recruitment of an ophthalmologist was a good return on ... investment. So when the contract got to him, he did not approve it.” In early March 2005, Shaw informed Morales that the contract had not been approved.
¶ 7. On November 30, 2005, Morales filed suit in the Circuit Court of Hinds County, alleging that Jackson HMA had breached its contract with him. He further alleged that he had relied to his detriment on misrepresentations made by Jackson HMA.
¶ 8. On September 12, 2011, the trial began. Morales and Shaw were the only *497 two witnesses called at trial. Morales testified that the November 11 letter was issued after corporate approval and that it formed a contract. Shaw denied that the November 11 letter formed a contract. Shaw also denied that she had any authority to confer a final contract on Morales-without receiving approval from corporate HMA.
¶ 9. On September 14, 2011, the jury returned a verdict in favor of Morales and assessed his damages at $2,275,000. Final judgment was entered on September 27, 2011. Jackson HMA filed this appeal.

ISSUES

¶ 10. Jackson HMA appeals the denial of its motions for directed verdict, judgment notwithstanding the verdict (JNOV), new trial, and/or remittitur. We address the following issues:
I. Whether there was sufficient evidence for the jury to find that the November 11, 2004, letter formed a contract between Jackson HMA and Morales.
II. Whether there was sufficient evidence to prove Morales’s claim for damages to a reasonable certainty.
III. Whether the trial court erred in granting jury instruction 9.
IV. Whether the trial court erred by denying remittitur.

STANDARDS OF REVIEW

¶ 11. “This Court’s standard of review on motions for directed verdict and judgment notwithstanding the verdict are the same.” Estate of Jones v. Phillips ex rel. Phillips, 992 So.2d 1131, 1146 (Miss.2008) (citing Spotlite Skating Rink, Inc. v. Barnes, 988 So.2d 364, 368 (Miss.2008)). Motions for directed verdict and judgment notwithstanding the verdict consider whether the “evidence is sufficient to support a verdict for the non-moving party.” Estate of Jones, 992 So.2d at 1146 (citing Spotlite Skating Rink, Inc., 988 So.2d at 368). ‘When determining whether the evidence was sufficient, the critical inquiry is whether. the evidence is of such quality that , reasonable and fairminded jurors in the exercise of fair and impartial judgment might reach different conclusions.” Poole ex rel. Wrongful Death Beneficiaries of Poole v. Avara, 908 So.2d 716, 726 (Miss.2005) (citing Jesco, Inc. v. Whitehead, 451 So.2d 706, 713-714 (Miss.1984)) (emphasis in original). “Thus, this Court considers whether the evidence, as applied to the elements of a party’s case, is either so indisputable, or so deficient, that the necessity of a trier of fact has been obviated.” Estate of Jones, 992 So.2d at 1146 (citing Spotlite Skating Rink, Inc., 988 So.2d at 368). “For purposes of our review, we consider all evidence in the light most favorable to the nonmoving party, and we view all reasonable inferences in the party’s favor.” Braswell v. Stinnett, 99 So.3d 175,, 178 (Miss.2012) (citing Thompson v. Nguyen, 86 So.3d 232, 236 (Miss.2012)).
¶ 12. “When considering a trial court’s denial of a motion for a new trial, this Court’s standard of review is abuse of discretion.” Bailey Lumber & Supply Co. v. Robinson, 98 So.3d 986, 991 (Miss.2012) (citing Poole, 908 So.2d at 726).
¶ 13. “The standard of review for the denial of a remittitur is also abuse of discretion....” Id. (citing Entergy Mississippi, Inc. v. Bolden, 854 So.2d 1051, 1058 (Miss.2003)).

ANALYSIS

I. Whether there was sufficient evidence for the jury to find that the November 11, 2004, letter formed a contract between Jackson HMA and Morales.
¶ 14. “Whether a contract exists involves both questions of fact and ques *498 tions of law.” Ham Marine, Inc. v. Dresser Indus., Inc., 72 F.3d 454, 458 (5th Cir.1995). However, where the existence of a contract turns on consideration of conflicting evidence, that presents a “question of fact properly presented to, and determined by, the jury.” Id. at 461. “Consequently, unless there was no credible evidence presented which might authorize the verdict, the jury’s findings must stand.” Id.
¶ 15. At trial, Morales proceeded on the theory that the November 11 letter formed a binding contract. “[Ujnder Mississippi law ... the test for determining whether a writing constitutes an enforceable contract is whether the parties have manifested an intention to be bound by its terms and whether the terms are sufficiently definite to be legally enforced.” Knight v. Sharif, 875 F.2d 516, 523 (5th Cir.1989) (citing Jones v. Mississippi Farms Co., 116 Miss. 295, 76 So. 880 (Miss.1917)). Shaw testified, and Jackson HMA argued that the November 11 letter, corresponding electronic mail communications, and/or the November 16 Physician Recruitment Agreement (with addenda) signed by Morales did not form a contract, because corporate never approved the terms, as was required by the Physician Recruitment Agreement. However, an electronic mail communication was presented which indicated that corporate had approved the terms of the November 11 letter. See infra ¶ 17. Thus, not only was competing testimony offered by Morales and Shaw, Shaw’s testimony presented a conflict with other evidence regarding corporate approval. “Under such circumstances intention must be determined from a consideration of the document and the acts and outward expressions of the parties.” Mid-Continent Tel. Corp. v. Home Tel. Co., 319 F.Supp. 1176, 1189 (ND.Miss. 1970) (citing Miss. Rice Growers Ass’n (AAL) v. Pigott, 191 So.2d 399 (Miss.1966)).
¶ 16. The September 24 letter employed the phrase “letter of intent” and specifically stated that the terms of the letter required corporate preapproval. Morales admitted at trial that this letter did not form a contract because it “no doubt” required corporate preapproval, which was not forthcoming.
¶ 17. But, on November 9, Jackson HMA informed Morales, through an email exchange with Comphealth, that “[Jackson HMA] did get preapproval” for the new terms that Finnegan had presented to corporate. Shaw followed up by sending Morales a second letter on November 11 which embodied the corporate-approved terms. In contrast to the September 24 letter, the November 11 letter did not include the phrase “letter of intent” and made no mention of the terms requiring further corporate approval.
¶ 18. Jackson HMA argues that the November 11 letter was not intended to be a contract, as it included the language, “[b]y signing and returning this letter, you will confirm your commitment to entering into a contractual agreement.... Accordingly, we will begin the process of assimilating contract documents for your review.” Jackson HMA finished the “process of assimilating contract documentsf,]” and sent Morales the Physician Recruitment Agreement, dated November 16, which contained terms approved by corporate and agreed to by Morales.
¶ 19. Jackson HMA also argues that the communications presented as evidence at trial show that the letter did not form a contract and that all parties understood that any final contract would have to obtain corporate approval. Along with the aforementioned letters and Physician Recruitment Agreement, the jury was presented numerous written and electronic *499 mail communications. The evidence presented at trial was conflicting. But, it is the jury, and not this Court, “which resolves all conflicts of evidence.” Venton v. Beckham, 845 So.2d 676, 687 (Miss.2003). The jury resolved that conflict in favor of Morales. When “consider[ing] all evidence in the light most favorable to [Morales], and ... viewing] all reasonable inferences in [Morales’s] favor,” sufficient evidence was presented to support the jury’s determination that a binding contract was formed between Morales and Jackson HMA. Braswell, 99 So.3d at 178. Therefore, the trial court did not err in denying Jackson HMA’s motions for directed verdict and for judgment notwithstanding the verdict on this issue.
II. Whether there was sufficient evidence to prove Morales’s claim for damages to a reasonable certainty.
¶ 20. This Court has stated, “[i]t is well-understood that in an action seeking damages, the plaintiff bears the burden of proof as to the amount of damages.” J.K. v. R.K., 30 So.3d 290, 299 (Miss.2009) (citing Puckett Mach. Co. v. Edwards, 641 So.2d 29, 36 (Miss.1994)). “[D]amages ... must be proven to a reasonable certainty and must not place the injured party in a better position than they otherwise would have been in.” Polk v. Sexton, 613 So.2d 841, 845 (Miss.1993). “One injured by a breach of contract is entitled to a just and adequate compensation and no more.” Id. at 844 (quoting McDaniel Bros. Constr. Co. v. Jordy, 195 So.2d 922 (Miss.1967)). In order to ensure that the nonbreaching party is not put in a better position than if the contract had been performed,[4] damages for lost future profits must be “proved with reasonable certainty” and should reflect “net profits as opposed to gross profits.” Lovett v. Garner, 511 So.2d 1346, 1353 (Miss.1987). Thus, gross profits must be reduced by the reasonable overhead expenses common to the Jackson HMA service area for the contract period at issue.
¶ 21. At trial, Morales was the only witness who offered testimony on damages. Morales testified that, during the recruitment process, Shaw provided him with a document prepared by MGMA, “a company that :.. surveys incomes and advises hospitals on what to expect.” That document was a physician-compensation survey, including ophthalmology. Utilizing the survey, Morales testifíéd, without objection, that the median income for an ophthalmologist was $645,558, the mean $708,128, and the top ten percent $1,097,381.[5]
¶ 22. Morales argues on appeal that “it would come as no surprise ... if the majority opinion herein affirming the damage verdict includes a disclaimer, limiting the precedential value of the holding to those instances where a defendant provides actual, authoritative/reliable future net income estimates-” (Emphasis added.) Basically, Morales argues that he should be allowed to rely solely on the document provided to him by Jackson HMA as credible evidence of his lost net income. As Morales’s reliance on this particular document as evidence of lost net income is misplaced, we reject this argument.
¶ 23. Morales recognizes that lost income should reflect net income. See supra *500 ¶ 22. Morales did not testify, nor does the document reveal, whether the MGMA survey represented gross or net income. When asked by his own attorney about MGMA, Morales conceded, “I don’t know if I’m the right person to ask this because this is used more by the hospitals than doctors.... ” Morales failed to provide sufficient evidence upon which the jury or a court could conclude that the income figures represented net income.[6]
¶ 24. Contrastingly, Shaw unequivocally testified that the numbers represented gross income.[7] She testified that Jackson HMA applied the median income for ophthalmologists in the survey to arrive at the September 24 offer of $650,000 gross for one year. The November 11 offer also was based on the median income in the survey, as Jackson HMA cut both the guarantee period and amount by exactly half ($325,000 for six months). However, out of those guarantees, “[Morales] would pay his overhead and his salary[,] ... his staff salary, his malpractice, his supplies, his lease, his utilities, everything that he needed to run his practice.... ” By their plain language, the September 24 and November 11 letters specifically provided for “gross income collections guarantee^].” (Emphasis added.) Therefore, the evidence submitted was insufficient to support the amount of damages awarded.[8]
¶25. Although this Court has allowed proof of lost profits to be accomplished *501 through “a party’s proof of its past profits[,]” the evidence of Morales’s past income is likewise inadequate to support the damages awarded. Lovett, 511 So.2d at 1353. Morales testified at trial that he had been unemployed since July 2003— more than thirteen months before he began negotiating with Jackson HMA. Prior to being unemployed, Morales had practiced in Arizona and Illinois. He testified that, while in Arizona, his net income was in the $140,000 range. Following his move from Arizona to Illinois, Morales testified that he earned about $160,000 a year.[9]
¶ 26. Other evidence adduced at trial was inadequate to support the amount of damages. The November 11 letter provided Morales a “gross collections income guarantee of $325,000 for six months.” (Emphasis added.) However, standing alone, the $325,000 gross guarantee, without consideration of the reasonable expenses to be incurred, is likewise inadequate to support the award.
¶ 27. The trial court did not err in denying Jackson HMA’s motions for directed verdict and judgment notwithstanding the verdict, for Morales offered sufficient evidence that he had suffered damage. But, insufficient evidence was adduced to undergird the jury’s award. As such, we reverse and remand for a new trial solely on the issue of damages.[10]
III. Whether the trial court erred in granting jury instruction 9.
¶ 28. Jackson HMA claims that the trial court should have granted its motion for a new trial because it erred in granting jury instruction 9. “Jury instructions are within the discretion of the trial court and the settled standard of review is abuse of discretion.” Watkins v. State, 101 So.3d 628, 635 (Miss.2012) (quoting Bailey v. State, 78 So.3d 308, 315 (Miss.2012)).
¶ 29. Instruction 9 read as follows:
The Court instructs you that CMMC [Jackson HMA] is responsible for the acts of its employees done within the course and scope of their employment and within the line of her duties even though such acts may be contrary to the principal’s express intentions.
In the present case, CMMC is bound by the actions or statements of Tess Shaw and Jay Finnegan performed or omitted in the scope of their employment with CMMC during their contract negotiations with Dr. Morales.
¶ 30. We agree that instruction 9, in its entirety, should not have been granted. There was no evidentiary support that Finnegan or Shaw acted contrary to Jackson HMA’s express intentions. The instruction also improperly implies that any and all acts done within the scope of a person’s employment automatically binds the principal, without establishing that the employee possessed authority — either actual or apparent — to bind the principal.
¶ 31. However, the error is harmless, for no reasonable juror could have *502 concluded that Finnegan or Shaw lacked, at a minimum, apparent authority when negotiating with Morales. Finnegan was the CEO of Jackson HMA. Shaw was the physician recruiter for Jackson HMA. She was involved with virtually all communications between Morales and Jackson HMA. She did all the leg work to bring Morales to Jackson, and she was responsible for sending Morales the September 24 letter, the November 11 letter, and the November 16 Physician Recruitment Agreement. Acting on behalf of Jackson HMA, she kept Morales informed throughout the negotiations and ultimate rejection.
¶ 32. Jackson HMA argues that “no representation was made” to Morales by Finnegan. However, the record, specifically the November 11 letter, suggests otherwise. The November 11 letter states, in pertinent part, “[t]his is to follow up on your conversation with Jay Finnegan regarding the terms of our offer....”
IV. Whether the trial court erred by denying remittitur.
¶ 33. Based on the preceding discussion of damages, the trial court had insufficient evidence to order a remittitur without engaging in speculation and conjecture. As such, the trial court did not err in denying remittitur.

CONCLUSION

¶34. Based on this analysis, Morales presented sufficient evidence for the jury to find that a contract existed. However, Morales presented insufficient evidence to support the jury’s damages award. We affirm the judgment for Dr. Morales, but reverse on the issue of damages and remand this case to the Circuit Court of Hinds County for a new trial solely on damages.
¶ 35. AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
DICKINSON, P.J., LAMAR, PIERCE, KING AND COLEMAN, JJ., CONCUR. KITCHENS, J„ CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY CHANDLER, J.
WALLER, C.J., NOT PARTICIPATING.

. Morales was not to become an employee of Jackson HMA, but, rather, was to set up his own practice with the financial assistance of Jackson HMA.

. The terms of the letter included a gross collections income guarantee of $650,000 for one year, a two-year forgiveness period, a $10,000 signing bonus, up to $15,000 in residential relocation expenses, up to $7,500 in office relocation expenses, $8,000 in marketing assistance, and $1,500 in practice set-up assistance.

.The signing bonus increased from $15,000 to $20,000.

. See Jeffrey Jackson & Mary Miller, Encyclopedia of Mississippi Law § 25:40, 30 (2001) ("[N]o judgment may place the non-breaching party in a better position than would have been the case had the contract been performed.”)

. The document reveals that the survey conducted for ophthalmologists consisted of 120 providers and 47 practices.

.I cannot agree with the dissent’s characterization of the testimony regarding the MGMA survey. Morales's cross-examination of Shaw reveals Morales’s knowledge of how to derive net income. However, no testimony was elicited to support net income. Shaw testified on cross-examination:
Q: MGMA, and this is the amount of money that they suggested you use as an income guarantee for someone that you recruit; is that correct?
A: They survey physicians that want to participate, it’s a volunteer survey, and they come up with the numbers that averages that this is what physicians make in the country of that specialty. There are several of those surveys.
Q: Okay. You’re saying that they come up with this. This is what they make?
A: This is what they generate in their practice as gross income to cover their overhead or this is what they make as a salary. There’s two different — in that book there’s a lot of information. That just happens to be one page out of that book.
Q: Okay. And do you recall from looking through that book how much income an ophthalmologist in this area would expect to earn on average?
A: In this Jackson area?
Q: Yes.
A: No. It will not be that specific.
Q: Okay.
A: It is a national. It will have national numbers, it will have different parts of the country like south, east, west or north. It's not going to be Jackson specific. But, no, no.
Q; I got you. I got you. You mentioned the word region. Do you recall what an ophthalmologist in this region would have expected.
A: No. I do not recall.
Q: Okay. But if Dr. Morales was able to pay all of his overhead, his people he’s working for, his insurance and all of these other things that CMMC was not paying for, and he was paid $50,000 a month, okay, and all of those overhead expenditures were $20,000 a month, then I think we can do some simple math and he would make $30,000 a month, right?
A: That would be his.

. Shaw’s testimony on direct examination does not support the dissent's conclusion of equivocation. She testified, regarding the MGMA survey:
Q: And what is the median income?
A: 645,558, but that’s gross.
Q: That’s gross, not net?
A: Correct.

. After modification, jury instruction 20 read, in pertinent part, "[ijncome is that net profit after operating expenses, including taxes, are deducted from revenues through July 2007.’’ Jackson HMA argues that this instruction was given in error as no evidence was presented *501 as to “what the operating expenses, etc. would have been....” Jackson HMA's argument that the instruction was given in error is correct because it lacked any evidentiary basis.

. In support of his testimony, Morales entered into evidence his IRS tax returns from 2001-2005.

. Jackson HMA also argues that Morales presented insufficient proof of reliance damages. Because we reverse and remand for a new trial on damages, this argument will not be addressed.