# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CA-01077-COA

**THE BANKING GROUP, INC.**                                            APPELLANT

v.

**SOUTHERN BANCORP BANK, JOSEPH J.**                          APPELLEES
**RICOTTA, AND CHRIS HESTER**

| | |
|---|---|
| DATE OF JUDGMENT: | 07/14/2021 |
| TRIAL JUDGE: | HON. PRENTISS GREENE HARRELL |
| COURT FROM WHICH APPEALED: | LAMAR COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | MICHAEL BRANT PETTIS |
| | MATTHEW WARD McDADE |
| | JAMES EVERETT LAMBERT III |
| ATTORNEY FOR APPELLEES: | JEFFREY DALE RAWLINGS |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | REVERSED AND REMANDED - 12/06/2022 |
| MOTION FOR REHEARING FILED: | |

**BEFORE BARNES, C.J., McDONALD AND LAWRENCE, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1.     The Banking Group Inc. (TBG) appeals the Lamar County Circuit Court's grant of summary judgment in favor of Southern Bancorp Bank (SBB), Joseph J. Ricotta, and Chris Hester on the breach of contract and fraud complaint that TBG filed concerning fees it claimed SBB owed for TBG's recruitment services. TBG contends that there were genuine issues of material fact that precluded summary judgment and that the circuit court erroneously dismissed its fraud claim. After a review of the record and arguments of counsel, we reverse and remand.

## Facts and Procedural History

¶2.     TBG is a recruiting business that finds and refers qualified candidates for positions in the banking industry.  Its sole shareholder is Charles West, who has over fifty years of experience in this field.  SBB is located in Little Rock, Arkansas, but has branches in Mississippi and other states.  Ricotta was SBB's eastern regional CEO.

*2018 Referral*

¶3.     In 2018, TBG referred a candidate to SBB to fill a vacancy at an existing SBB branch in Picayune, Mississippi.  According to West, TBG's standard fee for placements was 25% of the hiring salary plus a signing bonus, payable over nine months.  However, in exchange for SBB's exclusive use of TBG for recruitment purposes, West said he lowered his fee to 20%.

¶4.     TBG contends that the agreement for referrals was reflected in a letter that West emailed Ricotta on November 8, 2018.  The letter began by stating, "This shall confirm our mutual agreement concerning our [TBG] search for potential employees for your institution [SBB]."[1]  The letter explained that when SBB agrees on the terms of hire with a TBG referral, and the referral accepts those terms, TBG would then be entitled to a fee of twenty percent (20%) of the candidate's starting salary plus any signing bonuses.  SBB would pay this fee in four installments at various times over nine months.[2]  The letter continued,

_____

[1] Although the letter states that the fees are payable when SBB "engages the services of a *candidate* referred to you at any time by TBG," the letter also refers to "employees" and "candidates" in the plural elsewhere.  This use of the singular and plural became significant later.

[2] Twenty-five percent of the fee was due when the applicant started (within 10 days); twenty-five percent at the end of the first ninety days; twenty-five percent at the end of six months; and twenty-five percent at the end of nine months.

"Should the applicant terminate during any of the time periods . . . , [SBB] will only be responsible for payment of fees accruing through the date of termination." However, if any installment was not paid, SBB would owe the full amount outstanding. In addition, if collection measures had to be undertaken and TBG prevailed, SBB agreed to pay all costs as well as attorney's fees.

¶5. TBG referred a candidate at that time in 2018 and SBB paid the fees outlined in the letter.[3] However, SBB contends that TBG unilaterally sent the letter, that no one at SBB signed it, and that SBB never intended to create a long-term contract with TBG.

*2020 Referral*

¶6. In 2020, a dispute arose between TBG and SBB when TBG referred another candidate to SBB. Affidavits attached to pleadings in the record from West, Ricotta, and Hester give different versions of what occurred at that time.

*West's Affidavit*

¶7. According to West, he met Hester, a bank manager in Hattiesburg who was seeking to retain his position as "Market President," but with a new bank.[4] Hester even identified a specific commercial location where a branch bank could be located. With Hester's permission, West reached out to several banks on Hester's behalf, including Ricotta at SBB,

---

[3] TBG attached the invoice it submitted to Ricotta for the referral of this candidate. Although the exact amounts were redacted, it showed the calculations of the four installment payments that were owed based on the offer made to the candidate.

[4] The parties give no definition for the position of "market president" and we are unsure if this is a term of art used in the industry, therefore we will not speculate on its meaning.

which did not have a presence in the Hattiesburg area.

¶8.    In an April 9, 2020 letter to Ricotta, West related Hester's twenty-three-year background in banking and the ties and faithful clientele Hester had built over the years. In that letter, West said that Hester was looking to move to a stable mid-size community bank. West also indicated that Hester would not be that expensive, and that with an assistant and a lender or two, Hester would be able to man an office. West suggested that this opportunity "never presents itself in a virgin state," and the potential for profit could "handle any real estate cost from it [SBB establishing a branch]." Based on the wording in this April letter, West contends that Ricotta "knew at all times that the consideration of Hester included hiring a team of employees" because SBB was interested in opening a branch, which could not be accomplished by only one individual. In addition, West said that Ricotta met not only with Hester, but with six other people from Hester's current bank whom Ricotta eventually hired. West said that Ricotta also brought Hester and the team to Arkansas for further discussions.

¶9.    West said that Hester called him to talk about a request Ricotta made that Hester prepare a two-year detailed plan for a potential Hattiesburg operation. West said that he told Hester to prepare the document, although it was an onerous task, because it could be used with other potential employers. As evidence of this fact, TBG submitted an email that West had sent to another bank, to which West attached Hester's resume and evaluation, and promised to forward the plan Hester was preparing "for another company" when completed.

¶10.    West said that after Ricotta's first interview with Hester, West spoke to Ricotta about the hires of Hester's team, which West called a "lift out," and which would result in a higher

4

fee. West said he offered Ricotta a lower initial payment and an extension of the plan until the branch was profitable, but Ricotta said that such a discussion was "above his pay grade," and that Ricotta denied that he was hiring anyone but Hester.

¶11. West said that on July 9, 2020, Ricotta told him that he was going to make an offer to Hester. Ricotta asked, "how much will it take?" (i.e. what would be the terms). West told him that they could use the same agreement they used in 2018 and the fee would be 20%.[5] West said he asked Ricotta about the other potential hires, and Ricotta denied hiring the other employees. However, Ricotta wanted West to sign a document saying that TBG would not bill SBB for other hires. West declined to do so. West also denied any conversation about the names of the other individuals because, West contends, Ricotta always denied he was hiring anyone but Hester.

¶12. After the conversation, West prepared and emailed Ricotta another letter agreement. The subject line of the email reads: "Copy of our Service Agreement, for Chris Hester." The wording of the letter is exactly the same as the 2018 letter, the only difference is that West underlined the wording in two sections. He underlined the sentence that said SBB would not be responsible for future payments if the candidate should terminate at any time during the first nine months. West also underlined the wording concerning collection fees, specifically the section on attorney's fees which would be paid if it had to sue "and we prevail in the pursuit of same." Although the letter agreement is dated July 10, 2020, West emailed it to

_____

[5] Later on July 10, 2020, West sent another copy of the letter agreement to Ricotta because he noted that the original was misdated "July 20, 2020." In the letter, West makes a handwritten note on the agreement circling the 20% figure and writing "my std fee is 25%."

5

Ricotta on July 9, 2020, noting that the only change from the 2018 agreement was the underlining of certain words. The letter itself made no mention of any specific candidate's or candidates' name or names, and the email subject line referred only to Hester. West's email also requested a copy of Hester's offer. However, unlike SBB's practice in 2018, where the offer made to the candidate was supplied so TBG could prepare an invoice, in 2020, Ricotta did not provide TBG any information on the salary or bonus Hester was being paid.

*Ricotta's Affidavit*

¶13.    Ricotta said that TBG solicited SBB's business and referred a candidate in 2018. However, TBG and SBB never formed an ongoing referral contract. In 2020, West sent him an unsolicited letter about Hester. West later called Ricotta and introduced the two. Ricotta met with Hester several times over the next few months and SBB ultimately decided to open an SBB loan production office in Hattiesburg, hiring only Hester, but also several others who had worked with Hester at the bank he was leaving.

¶14.    According to Ricotta, prior to the formal hire, he and West discussed the fee to be paid to TBG in a "tense conversation." Ricotta said that he reiterated that SBB would only pay 20%, not the 25% that TBG usually charged. Ricotta also said that SBB would not pay TBG for the other employees it planned to hire because TBG did not refer them. Ricotta said that West could not even name these other individuals and admitted that he had had no discussions with any of them.[6] Ricotta said that West "eventually conceded that he did not

---

[6] In his affidavit, Hester said that he was the only candidate from his prior employer that was referred to SBB by TBG. He said that if he had known that TBG was referring any

6

know these individuals, had not referred them to the Bank, and would accept the 20% for Chris as closure." Ricotta points out that West's July 2020 letter provides that only referred candidates are compensable and that West did not ask for anyone's offer but Hester's.

*Hester's Affidavit*

¶15.   According to Hester, he had been given West's name by a co-worker who had used West herself.  Hester provided West with his resume and permitted TBG to communicate with banks on his behalf in his job search.  Hester then met with Ricotta and told West that the talks went well.  West told Hester that he was not involved in salary negotiations, just the initial referral.  Thereafter, Hester said that he had no further communications with West and that West never asked him for any information or documentation thereafter.

*Attempts to Resolve the Dispute*

¶16.   On July 25, 2020, West wrote to SBB's headquarters about the situation.  In that letter, West said that he had contacted Ricotta "about a candidate, Chris Hester, a market president at a bank in Hattiesburg who wanted to move with his staff and portfolio."  West said that Ricotta met with Hester in Hattiesburg and in Jackson.  West also said:

> When I talked to Ricotta prior to this visit I said, almost verbatim[,] "Joe, as we are talking about a 'lift out' situation with a substantial fee here, I would like to suggest an alternative to my standard schedule which I use with two other banks.  I will accept $5k for each candidate when Hester brings them over and a monthly payment of $5k until the total is paid.  If someone leaves, we take them off the list."  Ricotta chose not to respond to this proposal.

West continued in the letter that Ricotta then called and said he was going to make an offer

of his co-workers as well, he would have considered that a conflict of interest because he should not have been competing against his fellow workers for a job placement opportunity.

7

to Hester. West said Ricotta refused to talk about the team, except to ask West to sign a document saying he would not bill SBB for anyone except Hester. West said he did not hear from Ricotta in response to the July 10, 2020 letter agreement and that West learned on "LinkedIn" that Hester had been hired.

¶17. In response, on July 28, 2020, SBB's attorney sent West a letter offering to resolve the matter by paying TBG $45,000, although how that amount was computed is unknown because SBB never provided Hester's compensation information from which TBG could compute the fee for referring at least him. SBB's attorney pointed out that Hester was the only candidate referred by TBG and that other individuals for whom TBG claimed compensation neither knew nor had communicated with TBG. The attorney attached a proposed agreement that included the $45,000 amount that SBB offered to pay in exchange for TBG's agreement to release any claims for additional fees. TBG declined to agree and filed suit.

*Court Proceedings*

¶18. In its verified complaint filed in Lamar County Circuit Court, TBG alleged that the 2018 letter constituted a "mutual agreement" concerning TBG's search for potential employees for SBB which was ongoing beyond the actual employee hired at that time. TBG also alleged that the same letter agreement was sent to SBB in 2020. TBG contended that the agreement included compensation for Hester and for any members of a candidate's team that might also be hired. TBG alleged that SBB refused to provide a copy of Hester's offer and had denied that it owed TBG any compensation for Hester's referral, thereby breaching

8

its agreement with respect to Hester. TBG further alleged that SBB hired other members of Hester's banking team and refused to compensate TBG for those individuals. This, TBG alleged, constituted a breach of contract. In addition, TBG alleged that all defendants concealed from TBG Hester's offer as well as its hire of other individuals, constituting fraud.

¶19. SBB answered and raised several legal defenses, including fraudulent joinder to defeat diversity, failure to plead fraud with specificity, and venue. It admitted that it paid a fee to TBG in 2018 but it denied the existence of a contract, both at that time and in 2020. It contended that TBG demanded a twenty-five percent fee in 2020 to which SBB did not agree. However, SBB did admit that "it owed a 20% fee for Hester, but only for Hester" and that it had no agreement for anyone other than Hester. Further in its answer, SBB stated, "the Bank agreed to compensate The Banking Group, LLC for the hiring of Chris Hester, the only candidate referred to the Bank by the Banking Group, LLC, and no other." SBB also counterclaimed for a declaratory judgment that it was not bound by the unilateral terms of the July 10, 2020 letter to which it did not agree and that it was not obligated to pay a fee for anyone other than Hester.

¶20. Soon after TBG propounded written discovery, SBB, Ricotta, and Hester moved for summary judgment. In their identification of undisputed facts, they tracked facts set out in affidavits signed by Ricotta and Hester. They specifically said, "Ricotta agreed that the Bank would pay Mr. West 20% if it hired Chris Hester, just like it had done before," but there was no written agreement reflecting this. Concerning the fraud claim, Ricotta, and Hester argued that Hester had done nothing actionable and that Ricotta who acted as the agent for SBB

9

could incur no individual liability. Moreover, SBB argued that TBG would need to pierce the corporate veil to hold Ricotta liable. In addition, SBB argued that TBG had failed to plead the elements necessary for fraudulent concealment. Finally, SBB argued that it had offered to pay for hiring Hester but that TBG "had declined and wanted more: a larger fee for 'the team.'" It pointed out that the July 2020 letter specifically states that payment is owed only for candidates that TBG refers. TBG was attempting to alter the terms of that letter-agreement to include other unnamed and unknown individuals not directly referred by TBG.

¶21. TBG responded, saying that there were genuine issues of material fact in dispute on both the contract and fraud claims. It contended that the 2018 and 2020 letters were written contracts to which both TBG and SBB had agreed. TBG said that the agreements refer to TBG's search for "potential **employees**" and that "**candidates**" may be referred, clearly and unambiguously applying to multiple hires. TBG argued that the April referral letter indicated that Hester would not be expensive and could handle things with an assistant and lender or two. Thus, TBG argued, "SBB was liable for the hires it made of Hester and his team. Hester was never a solo hire, and in referring Hester to the Bank, TBG referred Hester, a Market President, and his team." With respect to Ricotta's individual liability, TBG argued that piercing the corporate veil was unnecessary because Ricotta was still responsible for his own tortious conduct apart from his affiliation with the bank. TBG argued that Hester's claims that it would be a conflict of interest for TBG to be referring co-workers along with him was disingenuous because Hester knew he would be opening a new branch and hiring

10

a team, which conveniently turned out to be Hester's former co-workers. This created a genuine issue of material fact as to Hester's participation in the fraud.

¶22. SBB replied and attached the affidavits of the six other individuals it hired for whom TBG claimed fees. Bart Borganelli said that he had worked with Hester, but he was not aware that Hester had been in contact with West or TBG. Sydney Forman whom SBB hired on July 24, 2020, said she never worked directly with Hester and only knew him in passing. Jessica Weatherford-Lowrey said in her affidavit that she worked with Hester and that Hester had actually hired her at the former bank. But Hester never told her that he had contacted a recruiter. Daniel Stewart was also hired by SBB on July 24, 2020, but he had never spoken to or had any communication with West or TBG prior to that time. Stewart felt he was hired by SBB individually and not as part of any team. William Whittington said in his affidavit that, in his sixteen years in banking, he had never heard of West or TBG and that although he worked with Hester from time to time at their prior bank, he was not part of any team headed by Hester. Will Franklin, another SBB hire in July 2020, who also formerly worked with Hester from time to time, stated he did not know and had not had any communication with TBG or West. All these hires said they did not know TBG or West, had had no communications with West and were not recommended to SBB by West.

¶23. TBG noticed the depositions of Ricotta, Hester, and the other employees SBB hired, but SBB, Ricotta, and Hester moved to stay discovery pending the outcome of their motion for summary judgment. TBG also filed a motion under Rule 56(f) of the Mississippi Rules of Civil Procedure, asking for additional time to conduct discovery and supplement its

11

response to SBB's motion for summary judgment. In addition, TBG filed a motion to compel SBB to more fully answer the interrogatories propounded and produce documents. SBB had objected to most of the interrogatories and did not produce even information concerning Hester's hire.

¶24. On June 6, 2021, the circuit court issued an order staying discovery. On July 12, 2021, the court heard arguments on SBB's motion for summary judgment via Zoom. The circuit court informed the parties it had reached a decision but gave each an opportunity to speak. Neither chose to argue and the court delivered its bench ruling that was later incorporated into its order on July 14, 2021, granting SBB's motion for summary judgment. The circuit court noted that the lawsuit was basically a breach of contract claim. The court found that it did not need to determine if there were factual issues in dispute if it found that there was no legally binding contract in the case. The court said there was no mutual agreement such that SBB bound itself to pay a 25% fee for Hester's hire. Nor, the court found, was there any contract that SBB would pay TBG a fee for any other banking employees that Hester brought with him. The court said that although it was initially inclined to find that SBB had agreed to pay TBG a 20% fee for Hester, TBG denied that it had a contract with SBB on those terms. All contracts must have mutual assent, and because mutual assent was never reached between SBB and TBG, there was no contract ever formed. There must be specific facts as to the formation of a contract and those facts to establish a contract were lacking. All other employees denied any knowledge of or involvement by TBG in theirs. The court found that the alleged fact that Hester would not come to SBB

12

unless he had his own team was not only a subjective conclusion, but it was irrelevant to whether TBG had any contract with SBB concerning the team members' employment. The circuit court also pointed out that the individuals involved were sophisticated business people who knew the basic elements of a contract. An agreement several years prior did not give rise to an implied contract on the current matter. This is especially true, the court explained, "when TBG presented SBB with a document reflecting the 2018 statement (never accepted verbally or in writing by SBB), that was unilaterally altered by TBG." There was no proof that SBB acquiesced to these terms and conditions. The circuit court granted the motion for summary judgment and dismissed the action with prejudice.

¶25. On July 23, 2021, TBG filed a motion to alter or amend judgment pursuant to Mississippi Rule of Civil Procedure 59(e), arguing that the existence of a contract and its terms are questions of fact to be resolved by the fact-finder. Moreover, TBG argued that the motion for summary judgment was really a *partial* motion, namely a motion for partial summary judgment concerning TBG's entitlement to fees for the employees Hester brought with him. TBG argued that there was no dispute that SBB owed TBG for its referral of Hester himself. Moreover, TBG said it never demanded a 25% fee, nor did it reject a 20% referral fee for Hester, as the circuit court erroneously found. TBG also argued that the circuit court erroneously found that there was no meeting of the minds concerning the 2020 agreement because they did agree on the terms for Hester's referral. TBG pointed to West's affidavit in which he said that Ricotta asked about the terms of the referral for Hester, to which West responded that they would be the same as in the 2018 agreement. Thereafter,

13

Ricotta hired Hester. TBG argued that if this did not establish a meeting of the minds, then there was a genuine issue of material fact about that issue in dispute that precluded summary judgment.

¶26. SBB responded that TBG had offered nothing new in its motion and that it was merely rearguing its position. SBB argued that the construction of contracts is a question of law committed to the court. On September 22, 2021, the circuit court heard oral arguments on TBG's motion to alter or amend the judgment. TBG argued its entitlement to fees at least for Hester citing the number of times in the record that SBB admitted that it owed the 20% fee for his referral. However, SBB pointed out that it had offered to settle the matter by paying $45,000 for Hester, but TBG rejected that offer. TBG had taken the position that the contract encompassed not only Hester's hire but the hiring of the other employees. SBB denied that the hiring of other individuals was included in any contract.

¶27. After hearing arguments on TBG's motion, the circuit court agreed that the parties did not have a meeting of the minds, and denied TBG's motion to alter or amend the judgment. Thereafter, on September 24, 2021, TBG appealed the rulings of the circuit court and now argues (1) that the circuit court erred in finding no genuine issue of material fact in dispute as to the existence of a contract; and (2) that the circuit court erred in failing to consider TBG's fraud claims.

**Standard of Review**

¶28. "The interpretation of a contract is a question of law that the Court reviews de novo." *Gulf Coast Hospice LLC v. LHC Grp. Inc.*, 273 So. 3d 721, 734 (¶34) (Miss. 2019) (citing

*Coleman & Coleman Enters. Inc. v. Waller Funeral Home*, 106 So. 3d 309, 314 (¶10) (Miss. 2012)). "Likewise, the Court reviews a trial court's grant of summary judgment de novo." *Id*. (citing *Kilhullen v. Kansas City S. Ry.*, 8 So. 3d 168, 174 (¶14) (Miss. 2009)). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." M.R.C.P. 56(c); *Par. Transp. LLC v. Jordan Carriers Inc.*, 327 So. 3d 45, 51 (¶15) (Miss. 2021). "The movant carries the burden of demonstrating that no genuine issue of material fact exists, and the non-moving party is given the benefit of the doubt as to the existence of a material fact." *Id.*

## Discussion

I.      **Whether the circuit court erred in finding no genuine issue of material fact in dispute as to the existence of a contract.**

¶29.    To prevail under a breach-of-contract claim, a plaintiff has the burden of proving by a preponderance of the evidence "(1) that a valid and binding contract exists; and (2) that the defendant has broken or breached it without regard to the remedy sought or the actual damage sustained." *Norman v. Anderson Reg'l Med. Ctr.*, 262 So. 3d 520, 527 (¶27) (Miss. 2019). "The elements of a contract are (1) two or more contracting parties, (2) consideration, (3) an agreement that is sufficiently definite, (4) parties with legal capacity to make a contract, (5) mutual assent, and (6) no legal prohibition precluding contract formation." *GGNSC Batesville LLC v. Johnson*, 109 So. 3d 562, 565 (¶6) (Miss. 2013).

¶30.    This Court has held that "'[t]he existence of a contract is a question of fact that is to

be determined by a jury, or a trial judge when a trial is conducted without a jury.'" *Crow v. Crow's Sports Ctr. Inc.*, 119 So. 3d 352, 356 (¶9) (Miss. Ct. App. 2012) (quoting *Hunt v. Coker*, 741 So. 2d 1011, 1014 (¶6) (Miss. Ct. App. 1999)).[7] The Mississippi Supreme Court reiterated this principle in *Jackson HMA LLC v. Morales*, 130 So. 3d 493 (Miss. 2013). In that case, Jackson HMA recruited Dr. Morales because its community needed an ophthalmologist. *Id.* at 495 (¶1). After initial discussions, a representative of Jackson HMA ultimately sent Morales a letter outlining "terms of our offer" that reflected guarantees approved by corporate HMA to assist Morales in setting up his office. *Id.* at 496 (¶5). Morales signed the letter and other contract documents, but due to a change in personnel at Jackson HMA, the contract was not approved. *Id.* at (¶6). Morales filed suit against Jackson HMA for breach of contract. *Id.* at (¶7). A jury returned a verdict in Morales' favor and awarded damages. *Id.* at 497 (¶9). On appeal, the supreme court said:

> Whether a contract exists involves both questions of fact and questions of law. However, where the existence of a contract turns on consideration of conflicting evidence, that presents a question of fact properly presented to, and determined by, the jury. Consequently, unless there was no credible evidence presented which might authorize the verdict, the jury's findings must stand.

*Id.* at 497-98 (¶14) (citations and internal quotation marks omitted). Even the two judges dissenting in *Morales* agreed that the existence of a contract was a jury question, dissenting

---

[7] In that case, the parties did not dispute the existence of a lease contract but disagreed over the enforcement of an option to purchase provision, which was the issue in a lawsuit filed in chancery court. *Crow*, 119 So. 3d at 356 (¶10). Accordingly, the chancery court decided the matter.

for other reasons.[8]  *Id*. at 502 (¶36).

¶31.    Recently, the Mississippi Supreme Court confirmed its holding in *Morales* in *Parish Transport LLC v. Jordan Carriers Inc*., 327 So. 3d 45 (Miss. 2021), and explained how to resolve the question of law/question of fact "dichotomy" in contract cases.  The supreme court stated:

> Specifically, "[t]he question of law/question of fact dichotomy requires a two-step inquiry in contract law." *Royer Homes of Miss., Inc. v. Chandeleur Homes, Inc.*, 857 So. 2d 748, 751 (Miss. 2003) (citing *Neider v. Franklin*, 844 So. 2d 433, 436 (Miss. 2003)).  "Questions concerning the construction of contracts are questions of law that are committed to the court rather than questions of fact committed to the fact finder." *Id*. at 752 (citing *Parkerson v. Smith*, 817 So. 2d 529, 532 (Miss. 2002)).  "In the event of an ambiguity, the subsequent interpretation presents a question of fact for the jury which we review under a substantial evidence/manifest error standard." *Id*. (citing *Clark v. State Farm Mut. Auto. Ins. Co.*, 725 So. 2d 779, 781 (Miss. 1998)).  "If the terms of a contract are subject to more than one reasonable interpretation, it is a question properly submitted to the jury." *Id*. (citing *Miss. Transp. Comm'n v. Ronald Adams Contractor, Inc.*, 753 So. 2d 1077, 1087 (Miss. 2000)).

*Id*. at 55 (¶30).  In that case, the supreme court held that the question of whether there was a valid electronic signature on a purported contract depended on the person's intent when he executed the writing, which was  a question of fact.  *Id*.  The supreme court concluded:

> The trial court erred by granting Jordan Carriers' motion for summary judgment. Viewing the evidence in the light most favorable to Parish Transport, a genuine issue of material fact remains regarding Doug Jordan's intent.  Accordingly, we reverse the judgments of the Court of Appeals and the trial court, and we remand this case for a fact finder to make a determination about Doug Jordan's intent.

*Id*. at 58-59 (¶42).

---

[8] The majority in *Morales* reversed the jury verdict on the amount of damages and remanded for a new trial solely on that issue, *id.* at 502 (¶34), but the dissent would have affirmed the jury verdict in total.  *Id*. at (¶36).

¶32.  In this case, we hold that there were numerous material facts in dispute concerning the existence and extent of a contract between the parties that preclude summary judgment. The record establishes that in 2018, TBG referred a candidate to SBB and submitted a general letter to SBB concerning the terms of the referral.  SBB paid TBG according to those terms.  Even though SBB signed no contract, a contract may be enforced if there is an offer, an acceptance, and consideration.  *Est. of Davis v. O'Neill*, 42 So. 3d 520, 527 (¶28) (Miss. 2010).  "It is well established, however, that a contract can and does arise through actions and unwritten agreements as much as through a carefully drafted written contract."  *Gatlin v. Methodist Med. Ctr., Inc.*, 772 So. 2d 1023, 1029 (¶20) (Miss. 2000).  An offer or an acceptance can be expressed through actions as well as words.  *Misso v. Nat'l Bank of Com., Memphis, Tenn.*, 231 Miss. 249, 255, 95 So. 2d 124, 126 (1957).  By its conduct in 2018, SBB could be seen as having accepted the terms outlined in TBG's letter and may have established a pattern of practice for future interactions with TBG.  This is a disputed fact for a fact-finder  to resolve as it considers the formation of a contract in 2020.

¶33.  In addition, whether the parties had discussed the hiring of others in addition to Hester is a critical fact in dispute.[9]  West recounts two discussions concerning the other hires in his affidavit.  In one, West claimed he had asked Ricotta about additional hires which would have resulted in additional fees.  He said Ricotta denied that he was hiring anyone other than Hester.  In the second conversation, West said he again raised the issue of hires in addition

---

[9] Because SBB admitted that it owed fees to TBG on Hester, a fact-finder probably would take little time determining that TBG and SBB had a contract, at least concerning Hester.

18

to Hester, especially because SBB was starting a new branch and would need other employees. West says that Ricotta again denied hiring anyone other than Hester. Ricotta, however, said in his affidavit that the two had one conversation concerning this matter at the time of Hester's hire. Ricotta said that they discussed these other individuals whom West could not even name and that West agreed he was entitled to fees only on Hester's referral. This factual dispute must be resolved by a fact-finder who can observe the witnesses, determine their credibility, and take into account other facts[10] to determine whether SBB and TBG had agreed on some contract, and if so, the terms of that contract, or whether SBB and Ricotta had defrauded TBG.

¶34.    Additionally, in its complaint, TBG alleged it had a contract with SBB for both the hire of Hester and for the hire of other employees who had worked with Hester. TBG pleaded that it had an ongoing referral contract established in 2018 that was confirmed in 2020. TBG never abandoned its claim for compensation for Hester and in fact, SBB counterclaimed for a declaratory judgment that it only owed for Hester's referral. Whether the parties had agreed, by word or by deed, upon compensation for Hester alone or Hester and others, was a disputed question of fact for the fact-finder to resolve, not the circuit court on summary judgment.

¶35.    Giving the non-movant TBG the benefit of the doubt, after a review of the pleadings

---

[10] For example, if the agreement was limited to Hester as SBB claims, why did SBB not follow its usual practice and provide Hester's offer amount so TBG could invoice it and SBB paid as it did in 2018? Or if it was opening a new branch and needed other employees, how did SBB conveniently hire, within weeks of Hester's hire, six other employees Hester had worked with at his former bank?

and evidence in the record, we find there was a material question of fact in dispute as to whether the parties had formed a contract in 2020, and if so, what the terms of the contract were. Because this was not yet a bench trial where the circuit court could decide whether a contract existed and because there were material facts in dispute on that issue for a jury (or the judge in a bench trial) to decide, the circuit court erred in granting summary judgment on TBG's contract claim.[11]

## II.	Whether the circuit court erred in failing to consider TBG's fraud claims.

¶36.	TBG pleaded fraud claims against Ricotta and Hester. TBG alleged that the two acted in concert "to conceal the terms of Hester's retention" and to conceal the fact that others on Hester's team were hired. TBG claimed that Ricotta and Hester acted knowingly, willingly, and with reckless disregard of TBG's rights, causing TBG a loss of compensation. Ricotta

---

[11] SBB's reliance on *Parkerson v. Smith*, 817 So. 2d 529 (Miss. 2002), as support for its argument that the circuit court had the legal authority to resolve the issues dealing with the creation of a contract in this case is misplaced. In *Parkerson*, there was no dispute between the parties that a contract had been formed. There, Parkerson, the purchaser of a mobile home had signed an arbitration agreement included in his retail installment contract with the seller, Smith, the owner of Town & Country Mobile Homes Inc. *Id*. at 531 (¶3). Parkerson and Smith also signed another document entitled "Manufacturer Home Set up and Warranty." *Id*. at (¶4). Parkerson was also given additional warranties. *Id.* When the mobile home arrived, according to Parkerson, it was set up in a defective manner, and Parkerson sued the manufacturer, Champion Builders, and Smith for breach of warranty. *Id*. at 530-31 (¶1). The circuit court dismissed the suit and ordered Parkerson to submit to arbitration. *Id*. at 531 (¶2). On appeal, the Mississippi Supreme Court held that the Magnuson-Moss Warranty Act superseded the Federal Arbitration Act and that actions on breaches of warranty are not subject to arbitration. *Id*. at 534 (¶17). Therefore, the supreme court found that the circuit court erred in dismissing the suit and compelling arbitration. *Id.* Clearly, in *Parkerson*, there was no dispute about whether a contract including arbitration existed; the issue was whether Parkerson's breach-of-warranty claims were controlled by another statute that exempted such claims from arbitration. Thus, *Parkerson* is inapplicable here.

20

and Hester sought summary judgment on those claims. Although both parties briefed the fraud issue to the circuit court, the court made no mention of, or ruling on, it in its order granting summary judgment on the contract claim, nor in its order denying TBG's motion to alter or amend the judgment. However, by dismissing the entire case, the circuit court also dismissed TBG's fraud claim as well.

¶37. Without any definitive ruling by the circuit, we have nothing to review concerning the validity of the circuit court's decision. However, because we are remanding this case for a trial on the issue of breach of contract, we direct that the issue of the viability of TBG's claims of fraud be remanded for disposition as well.

## Conclusion

¶38. Because there was a dispute of fact over the existence of a contract in this case, which is a matter for a fact-finder to determine, we reverse the circuit court's grant of summary judgment in favor of SBB, Ricotta, and Hester, and remand for further proceedings consistent with this opinion.

¶39. **REVERSED AND REMANDED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**